258 N.J. Super. 320 (1992)
609 A.2d 517
THERESA ANN GILBERT, PLAINTIFF-RESPONDENT,
v.
DURAND GLASS MANUFACTURING COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 9, 1992.
Decided July 17, 1992.
*322 Before Judges O'BRIEN, HAVEY and BRAITHWAITE.
Michael F. Kraemer argued the cause for appellant (White & Williams, attorneys; Michael F. Kraemer on the brief).
Harry Furman argued the cause for respondent (Eisenstat, Gabage & Berman, attorneys; Harry Furman on the brief).
The opinion of the court was delivered by HAVEY, J.A.D.
In this employment wrongful discharge action, defendant Durand Glass Manufacturing Company, Inc. (Durand) appeals from a $150,000 judgment entered on a jury verdict in favor of plaintiff. Durand also challenges the award to plaintiff of prejudgment interest in the amount of $31,633.04. The gravamen of plaintiff's complaint was that Durand had terminated her in violation of its oral policy to give employees a verbal and successive written warnings before termination. Durand argues that plaintiff, an at-will employee, failed as a matter of law to establish a prima facie case of wrongful discharge because: (1) the Woolley[1] doctrine applies only to a written company policy concerning termination of employment, and not to verbal policies, and (2) plaintiff failed to prove by convincing evidence that a clear and definite oral promise, conveyed to her, *323 was made by Durand not to terminate her without warning. Durand also contends that the trial judge erred in awarding prejudgment interest. We affirm the judgment, but reverse the prejudgment interest award.
Plaintiff began working for Durand in August 1982 as a glassware quality inspector. Her responsibilities involved inspecting the glass work as it came from the "hot end" to the "cold end" of the plant. It is undisputed that during her employment there was no written policy regarding warning notices prior to termination. For example, Durand's written "Rules of Conduct" did not establish a warning procedure. However, plaintiff testified that she was privy to many conversations during her employment in her foreman's office whereby employees would be told "[t]his is your first warning, this is your second warning." She also stated that her supervisor, John Johns, told her that the only cause for "immediate discharge" was insubordination.
Moreover, Ronald Lipscomb, a cold-end supervisor, testified that sometime in 1982 the cold-end supervisors met to discuss problems concerning absenteeism. A policy was subsequently implemented whereby offending employees would receive an initial verbal warning and three successive written warnings. The procedure was to be utilized in the cold end, but Lipscomb was under the impression that "eventually it would be on a plant-wide basis." He also stated that the policy was extended to other infractions besides absenteeism. Although the policy was finalized, the final step of discharge was "not carved in stone" in that discharge was left to the discretion of the department head and supervisor involved. Lipscomb also explained that there were exceptions to the warning procedure. People who were newly hired who did not work out, employees who were insubordinate or possessed firearms or engaged in drinking alcoholic beverages could be terminated without the requisite warning. Lipscomb was of the belief that he was otherwise not authorized to discharge an employee without adhering to the warning policy. The warning notice form *324 devised at the meeting was revised by the personnel office and the forms were distributed by it to supervisors who requested them.
Joanne Simpkins, who worked for Durand for eight years, also testified that sometime in 1983 all employees in her crew were advised by their foreman of the warning policy. According to Simpkins, plaintiff was the only person she knew who was discharged without receiving any warning. Edward Dzierwinski, a shift supervisor, corroborated the existence of a "write-up system" which started in early 1983. The purpose of the "system" was to warn employees about wrongdoing so they could correct it. He and other supervisors used the warning notices, but he acknowledged it was possible that some supervisors did not.
Plaintiff submitted personnel records memorializing 18 different instances in which the formal warning procedure was utilized between 1983 and 1988 for a variety of offenses in different departments, including damage to equipment, failing to wear safety glasses, absenteeism, poor job performance, irresponsible behavior, improper labeling and smoking.
Joyce Marshall, assistant to the personnel director, testified that she knew of no written policy regarding warning notices for discipline. However, she admitted that Durand's personnel files contained "quite a few" warnings, both verbal and written. She stated that a "large number" of management personnel utilized the warning system. In 1987, Marshall wrote a letter to an employee explaining this procedure. She also gave an example of an unemployment compensation form on which she indicated that a terminated employee was "on the final written warning." Another unemployment form, declining benefits, noted that the applicant "had one verbal and two written warnings" prior to discharge.
Martin Bush, the personnel director, also admitted to the existence of the warning policy. In 1983, he wrote a letter to a company manager regarding the poor attendance of two employees. *325 Bush stated that one should be given a written notice, to be followed by a final written warning; the other should be given a verbal warning, confirmed in writing. On another occasion, Bush wrote a "second and final warning" to an employee regarding excessive absenteeism. The warning system was also used in plaintiff's department, quality control. An inspector had failed to notice defective labels. Lipscomb testified that he recommended disciplinary action be taken against the inspector, and he and Johns co-signed the written warning form.
Plaintiff testified that her supervisor praised her work. Johns admitted that plaintiff was a dependable and conscientious employee, and acknowledged telling plaintiff on several occasions that her job was secure. However, according to Johns, plaintiff was antagonistic, argumentative and disruptive. Plaintiff explained that in March 1987, approximately one week before she was terminated, her entire crew was having a problem with their supervisor, Lipscomb. Lipscomb acknowledged the problem and stated that he told the department head he "wanted [plaintiff] off my shift."
Plaintiff was terminated on March 23, 1987. She asked Johns and Bush why she was being fired and stated "I've done nothing wrong. I've never been warned. I've never been written-up. I've never been nothing. Why are you firing me?" Bush responded, "Nobody in here likes you and nobody wants to work with you." It is undisputed that plaintiff never received any warning, written or oral, prior to her termination.
Plaintiff's complaint charged, inter alia, that Durand had "commenced a policy of responding to alleged violations" of its "Rules of Conduct" through a system of warnings leading to discharge. She asserted that Durand nevertheless terminated her in violation of this policy, with no verbal or written warnings being given. She claimed that Durand "breached implied and express contracts" with her and sought damages for lost earnings as well as humiliation, mental and physical suffering.
*326 At the close of plaintiff's proofs, Durand moved to dismiss the complaint, arguing that plaintiff had failed to demonstrate there was a generally applicable and consistently applied policy that Durand would not terminate an employee prior to giving verbal and written warnings. It also asserted plaintiff failed to establish that she was told of the existence of any such policy. In denying the motion, the trial judge determined that the existence of such a policy, whether it was consistently applied and whether plaintiff had a right to expect that any such policy would apply to her were jury questions. The jury reached the unanimous verdict in favor of plaintiff and awarded her $150,000 compensatory damages for lost wages. In the final judgment, the trial judge added $31,633.04 prejudgment interest.
In Woolley v. Hoffmann-La Roche, 99 N.J. 284, 285-86, 491 A.2d 1257, modified, 101 N.J. 10, 499 A.2d 515 (1985), our Supreme Court held that absent a clear and prominent disclaimer, an implied promise contained in a company personnel manual that an employee will be terminated only for cause may be enforceable against the employer even if the employment is of an indefinite duration and may be terminated at will. It found that when an employer circulates a manual that provides for job security provisions, the judiciary, "instead of `grudgingly' conceding the enforceability of those provisions, ... should construe them in accordance with the reasonable expectations of the employees." Id. at 297-98, 491 A.2d 1257 (quoting Savarese v. Pyrene Mfg. Co., 9 N.J. 595, 601, 89 A.2d 237 (1952)). Because job security is a fundamental protection for workers, the Court noted that "[i]f such a commitment is indeed made, obviously an employer should be required to honor it." Woolley, 99 N.J. at 297, 491 A.2d 1257. Further, it observed that "[o]ur courts will not allow an employer to offer attractive inducements and benefits to the workforce and then withdraw them when it chooses, no matter how sincere its belief that they are not enforceable." Id. at 300, 491 A.2d 1257.
*327 In determining the "reasonable expectations" of the plaintiff in Woolley, the Court emphasized that he had been employed without any individual contract, and thus once he was given the employment manual which represented that he would not be fired without cause, it was "almost inevitable" that he would "regard it as a binding commitment, legally enforceable, concerning the terms and conditions of his employment." Id. at 299, 491 A.2d 1257. Thus, the Court held that such personnel manuals "widely distributed among a large workforce are supported by consideration and may therefore be enforced as a binding commitment of the employer." Id. at 302, 491 A.2d 1257. Applying contract principles, the Court held that such a "manual is an offer that seeks the formation of a unilateral contract  the employees' bargained-for action needed to make the offer binding being their continued work when they have no obligation to continue." Id. at 302, 491 A.2d 1257.
In Shebar v. Sanyo Bus. Sys. Corp., 218 N.J. Super. 111, 526 A.2d 1144 (App.Div. 1987), aff'd, 111 N.J. 276, 544 A.2d 377 (1988), we held that the "thrust of the Woolley holding and the rationale as well as the public policy on which it is based is directed to the existence of the employer's general policy rather than the form in which it is expressed." 218 N.J. Super. at 120, 526 A.2d 1144. Judge Pressler noted that the difference between a written policy contained in a company manual and a policy otherwise expressed presents an "issue of proof rather than of substance." Id. Of course, the oral statement of the policy by the employee's supervisors is "probative only if plaintiff is able to prove that their statements constituted an accurate representation of policy which they were authorized to make." Id. at 121, 526 A.2d 1144. We quoted with approval, as did the Supreme Court in Woolley, (see 99 N.J. at 303-04, 491 A.2d 1257), the following dictum in Toussaint v. Blue Cross & Blue Shield of Mich., 408 Mich. 579, 613, 292 N.W.2d 880, 892 (1980):
While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them *328 known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation." [Shebar, 218 N.J. Super. 120-21, n. 2, 526 A.2d 1144 (quoting Toussaint, 408 Mich. at 613, 292 N.W.2d at 892) (citations omitted).]
The Supreme Court affirmed our decision in Shebar, but on different grounds. It characterized plaintiff's claim that his employer had made an oral promise to him that he would be terminated only for cause as being a special agreement "with a particular employee, not a general agreement covering all employees." 111 N.J. at 288, 544 A.2d 377. Thus, the Court found it unnecessary to consider "whether to extend our decision in Woolley to instances where a company has orally communicated an established company-wide policy to its employees." Id. The Supreme Court's holding in Shebar is therefore not dispositive here, since plaintiff never alleged that Durand made a specific, individual oral agreement with her setting forth the conditions of termination. See also Woolley, 99 N.J. at 293, 295, 491 A.2d 1257.
We reject Durand's contention that a Woolley claim requires that any policy concerning termination must be in writing. We endorse the rationale applied by Judge Pressler in Shebar, that the difference between a written policy and a policy otherwise expressed is "an issue of proof rather than of substance." 218 N.J. Super. at 120, 526 A.2d 1144. The question is whether a correct understanding of the underlying interests involved in the relationship between the employer and its workforce "calls for compliance by the employer with certain rudimentary agreements voluntarily extended to the employees." Woolley, 99 *329 N.J. at 292, 491 A.2d 1257. In our view, such "rudimentary agreements" may be expressed in a writing or verbally.[2]
Moreover, there is no conceptual difference between a written and oral promise when one considers the public policy underpinnings to the Woolley doctrine. When an employer chooses to establish personnel policies and practices, and makes them known to its employees, the employment relationship is "presumably enhanced." Toussaint, 408 Mich. at 613, 292 N.W.2d at 892. On the one hand the employer gains "an orderly, cooperative and loyal work force," and on the other hand the employee is secure in "the peace of mind associated with job security and the conviction that he will be treated fairly." Id. We must therefore focus upon whether this mutuality of benefits has evolved because of established, company-wide personnel policies, however expressed. Also, as Woolley makes clear, there are simple ways for the employer to put to rest any ambiguity concerning whether there exists a company policy of giving notice prior to termination. All that need be done is the dissemination among the employees of an appropriate and prominent written disclaimer that any such termination policy exists. 99 N.J. at 309, 491 A.2d 1257. See also Preston v. Claridge Hotel & Casino, Ltd., 231 N.J. Super. 81, 87, 555 A.2d 12 (App.Div. 1989).
We are also of the belief that limiting Woolley to the written policy would permit the employer to maintain an unwritten policy concerning termination and apply it in a selective and disparate manner. The employer would secure the benefits of an unwritten policy ("the orderly, cooperative and loyal work *330 force") but nevertheless indiscriminately terminate at will in defiance of the oral policy and reasonable expectations of the employees.
What may be distilled from the Woolley/Shebar analysis is that the policy, written or oral, must contain an express or implied promise concerning the terms and conditions of employment. It must also be "a definitive, established, company-wide employer policy," Shebar, 218 N.J. Super. at 120, 526 A.2d 1144; see also Woolley, 99 N.J. at 302, 491 A.2d 1257, and the employer's statements must constitute "an accurate representation of policy" which the employer was authorized to make. Shebar, 218 N.J. Super. at 121, 526 A.2d 1144. However, "[n]o pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally." Toussaint, 408 Mich. at 613, 292 N.W.2d at 892. It is enough that the employee reasonably believes that a particular personnel policy has been established and is applied consistently and uniformly to each employee. Id. Also, the enforceability of such a provision must be construed in accordance with "the reasonable expectations of the employees." Woolley, 99 N.J. at 298, 491 A.2d 1257.
Applying this analysis, we are satisfied that plaintiff established a prima facie case of wrongful discharge. She presented proof that Durand created an environment in which she and other employees reasonably believed that a warning policy existed. Plaintiff and her witnesses, including representatives from management and employees from the personnel office, testified that the policy existed. For example, Lipscomb testified a warning system was implemented in the cold-end department but that "eventually it would be on a plant-wide basis." Joanne Simpkins corroborated the existence of the policy, as did Edward Dzierwinski, a shift supervisor. Plaintiff submitted personnel records memorializing 18 different instances *331 in which the warning procedure was utilized between 1983 and 1988 in different departments in the company. The notices, authorized by the personnel office, included the language of a progressive disciplinary policy, with clear reference to verbal and written notices before discharge. We agree entirely with the trial judge that it was for the jury to decide whether: (1) the policy was pervasive and company-wide; (2) the pronouncements were an accurate representation of policy and were authorized to be made, and (3) the warning policy created an environment in which plaintiff reasonably expected that the policy would be enforced uniformly and fairly.
We are also satisfied that Durand's contentions that the trial judge misstated the standard of proof required in a wrongful termination case, and that the judge improperly instructed the jury on a "quasi estoppel theory" are completely without merit. R. 2:11-3(e)(1)(E).
However, we agree with Durand that the trial judge erred in awarding prejudgment interest. The $150,000 jury award was primarily for plaintiff's future lost wages. In making the award, the trial judge observed that:
I have reread all of the communications submitted, and I find and determine that a wrongful discharge action is akin to a tort action although, of course, the law of contracts is applicable. Insofar as prejudgment interest in pure contract actions is discretionary and insofar as prejudgment interest in tort actions is automatic, I have decided to exercise my discretion in favor of prejudgment interest in this particular case.
R. 4:42-11(b) requires prejudgment interest in tort actions unless exceptional circumstances exist, but in contract actions the award is within the sound discretion of the trial court. See Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 478, 541 A.2d 1063 (1988). As to contract actions, the court must make its determination in accordance with "equitable principles," and ordinarily we will defer to the trial judge's exercise of discretion unless it represents a manifest denial of justice. County of Essex v. Waldman, 244 N.J. Super. 647, 667, 583 A.2d 384 (App.Div. 1990), certif. denied, 126 N.J. 332, 598 A.2d 890 (1991).
*332 In Ruff v. Weintraub, 105 N.J. 233, 245, 519 A.2d 1384 (1987), the Supreme Court rejected the argument that prejudgment interest should not be awarded on that portion of a judgment representing future losses. The court determined that although R. 4:42-11(b) provides that the running of such interest may be suspended "in exceptional cases," Ruff was not such an exceptional case. Id. However, it referred the matter to the Civil Practice Committee to reconsider the matter of prejudgment interest awards for future losses. Id. at 246, n. 6, 519 A.2d 1384.
However, Ruff was a tort case. An employee wrongfully discharged in violation of a company policy is not entitled to tort damages. See Noye v. Hoffmann-La Roche, Inc., 238 N.J. Super. 430, 436-37, 570 A.2d 12 (App.Div.), certif. denied, 122 N.J. 146-47, 584 A.2d 218 (1990). Thus, the trial judge here was incorrect to the extent that he reasoned that "a wrongful discharge action is akin to a tort action[.]"
In Preston, 231 N.J. Super. at 88-90, 555 A.2d 12, while we noted that plaintiff's lost wages for wrongful discharge constituted a breach of contract claim, we allowed prejudgment interest on lost wages that had accrued up to the date of the verdict because defendant had "exclusive use of the moneys that plaintiff would have earned and was entitled to recover." Here, because plaintiff's claim is couched in breach of contract, prejudgment interest is not required under R. 4:42-11(b). Preston is distinguishable since there the prejudgment interest was awarded for lost wages that had already accrued as of the date of the jury verdict, whereas here, plaintiff's verdict was for the most part for future wage loss. Preston's rationale, that defendant had exclusive use of the monies that plaintiff would have earned and was entitled to recover, is also inapplicable. Under the circumstances, we are satisfied that the trial judge abused his discretion in granting prejudgment interest on plaintiff's wage loss award.
*333 The judgment entered on the jury award of $150,000 is affirmed. We reverse and vacate the award of prejudgment interest.
NOTES
[1] Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257, modified, 101 N.J. 10, 499 A.2d 515 (1985).
[2] In arguing that Woolley applies only to written policies, Durand cites Brunner v. Abex Corp., 661 F. Supp. 1351 (D.N.J. 1986). In Brunner, the court refused to enforce the employer's oral assurances to plaintiff that her job was secure because "Woolley was unmistakeably limited, even in its broadest interpretation, to commitments arising out of written communications by the employer to the employee." Id. at 1356. However, Brunner was decided six months before our decision in Shebar, where Woolley was extended to unwritten policies.