David R. FISCHER, Plaintiff,

v.

**ALLIED SIGNAL CORP.,**
et al., Defendants.

Civil Action No. 95–2198.

United States District Court,
D. New Jersey.

Sept. 4, 1997.

Dennis H. Sabourin, Rabner, Allcorn, Baumgart & Ben–Asher, Upper Montclair, NJ, for Plaintiff.

Gregory Parliman, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for Defendants.

## OPINION

WOLIN, District Judge.

At age 39, plaintiff David Richard Fischer ("Fischer") was terminated as an employee of defendant Allied Signal Corporation ("Allied"). At the time of termination, Fischer had been a manager in Allied's Engineering Plastics Department for roughly two years. Allied terminated Fischer's employment in the context of a reorganization of the Engineering Plastics Department. The reorganization eliminated Fischer's prior position and left the department with seven newly-structured managerial positions. Fischer, as well as all other individuals who held managerial positions prior to the reorganization, had to reapply for a managerial position within the Engineering Plastics Department. Fischer applied for five of the seven newly-created positions. Fischer was not selected for any of the five slots. Allied filled the five positions with individuals who were 55, 47, 42, 38 and 32 years old. Fischer alleges that he was not selected for one of the five positions

because of his age. Consequently, Fischer contends that Allied violated New Jersey's Law Against Discrimination ("NJLAD"), N.J.S.A. §§ 10:5–12. Fischer also alleges claims for breach of implied contract of employment and promissory estoppel.

Before the Court today is Allied's motion for summary judgment. The Court has reviewed the written submissions of the parties and decides this motion pursuant to Federal Rule of Civil Procedure 78. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Allied's motion requires the Court to examine the elements of a *prima facie* case of age discrimination under NJLAD. As discussed herein, the core of a *prima facie* case is evidence adequate to create an inference of age discrimination. Because the facts of this case do not give rise to such an inference, the Court concludes that Fischer has failed to prove his *prima facie* case of age discrimination. The Court also concludes that no implied contract of employment nor promise of employment existed in this case. As a result, the Court will grant Allied's motion in its entirety.

## I. FACTS

Fischer began his employment with Allied in 1983 and, over the next eight years, held various positions at Allied. *See* Fischer Aff. ¶¶ 1, 4–5. In 1991, he was promoted to the position of Select Industries ("SI") Manager, the position he held at the time of the reorganization, as described below. *See id.* ¶ 6.

### A. Select Industries Manager

Fischer's responsibilities as SI Manager covered the Lawn and Power Industry, the Electrical/Electronic ("EE") Industry, Select Industries (office furniture and wheelchair components), and Distribution. *See id.* ¶ 8. By the end of 1992, total sales under Fischer's supervision were $50,919,000, of which Lawn and Power contributed over $38,253,-000 or 75.1%. *See id.* ¶ 9. In addition, Fischer managed twelve Allied employees, including three managers. *See id.* ¶ 10.

As SI Manager, Fischer reported directly to the Director of Sales in Allied's Engineering Plastics Department in Morristown, New Jersey. *See id.* ¶ 7. At the time Fischer assumed the position of SI Manager, the Director of Sales was Gary Blackwood. In February 1993, Blackwood was replaced by Michael Apperson, a defendant in this case.[1] Prior to the reorganization, there were five manager-level positions in the Engineering Plastics Department sales division who reported directly to Blackwood and later to Apperson. *See id.* ¶ 17.

### B. The Reorganization

By late 1992, senior management at Allied had determined that the Engineering Plastics Department was in need of a reorganization. *See* Parliman Aff. Ex. B at 158:16–159:1 ("Apperson Dep."). On March 31, 1993, Apperson announced the terms of a plan to restructure the department. *See id.* Ex. C at 71:7–21 ("Fischer Dep.").

The terms of the reorganization involved the creation of seven newly titled manager-level positions in the Engineering Plastics Department. All existing managers, including Fischer, were allowed to apply for these jobs when they were posted. *See* Fischer Dep. at 103:17–104:2; Apperson Dep. at 305:5–10. Plaintiff applied for five of the new positions: (1) West Regional Sales Manager; (2) East Regional Sales Manager; (3) Lawn and Power Manager; (4) Furniture/EE Manager; and (5) Distributors/Compounder Manager. *See* Fischer Dep. at 98:13–99:4.

According to the posted job descriptions of the newly created managerial positions, the Regional Sales Managers (East and West) would each be responsible for approximately $60 million in sales and between ten and fifteen employees. *See* Fischer Aff. ¶ 11. Thus, in his capacity as SI Manager, Fischer managed a total sales volume and an Allied sales force similar in scope to those of the new East and West Regional Sales Managers.

In addition, as SI Manager Fischer was responsible either directly or in a supervisory capacity for all of the duties of the newly created position of Lawn and Power Manag-

---

1. Blackwood voluntarily relinquished this position in 1993 in order to assume a different position with Allied in the South. Blackwood is apparently still employed at Allied.

er. *See id.* ¶ 12. As SI Manager, Fischer's functions and responsibilities with regard to the Lawn and Power Industry matched the functions and responsibilities of the new Lawn and Power Manager as laid out in the job description of that position. *See id.* ¶ 15.

In all, approximately thirty internal candidates, as well as three external candidates, applied and were interviewed for the seven managerial positions. *See* Apperson Dep. at 305:5–10. Fischer interviewed for the new positions on April 29, 1993. In May 1993, Fischer was advised that he would not be placed in any of the newly established managerial positions and his employment was effectively terminated. *See* Fischer Dep. at 5:17–6:3.

### C. Fischer's Managerial Skills

On April 13, 1993, prior to interviewing any of the managerial candidates, Apperson held a management resource review meeting with several other Allied employees, including George Rose (the Human Resources Manager for Engineering Plastics) and Krish Rao (the Director of Research and Technology). At that meeting, Apperson discussed the reorganization and a number of the candidates for the new positions. Apperson recalls noting at the meeting that Fischer "clearly needed to work on his management skills because his style was intimidating to a number of people." Apperson Dep. at 462:23–25. Apperson also recalls indicating that Fischer "had a fairly good history of working very diligently to fulfill commitments … and had a good knowledge of a number of different [Allied] businesses…." *Id.* at 461:16–462:22.

Apperson stated that he based his negative appraisal of Fischer's management skills on a number of incidents. First, on February 22, 1993, soon after Apperson became Sales Director, he attended a quarterly meeting of Fischer's group, run by Fischer. This was the first time that Apperson and Fischer met. Apperson observed that the meeting was "very poorly run," with "minimal structure" and "minimal consistency, if any, between the presentations." *Id.* at 434:25–435:4. Apperson also observed that Fischer's treatment of his staff varied from one employee to another, and that Fischer was "antagonistic" and "aggressive" toward Ter-

ry Rosell, one of his subordinates. *See id.* at 435:7–24. Apperson noted that Fischer's actions "appeared to cause discomfort in the rest of the room." *Id.* at 436:16–22.

Fischer, however, claims that the quarterly meeting went well. *See* Fischer Aff. ¶ 44. He claims that it was ordinary and uneventful and that there were no problems between Rosell and him. *See id.* ¶ 45. In fact, Rosell testifies that the meeting "was well run by Fischer" and that Fischer was in no way antagonistic toward him. *See* Rosell Aff. ¶¶ 29–36. Rosell's testimony that the meeting was well-run and without incident is supported by the testimony of two other employees who attended the meeting, as well as that of Blackwood. *See* Pilotti Aff. ¶¶ 18–22; Gibson Aff. ¶¶ 28–32; Sabourin Aff. Ex. C at 40:14–41:24 ("Blackwood Dep.").

Apperson also claims that he based his negative assessment of Fischer's managerial skills in part on statements made by two of Fischer's subordinates, Rosell and Brian Robinson, who stated that Fischer's management style was "one of intimidation versus working together." *See* Apperson Dep. at 341:4–10; 377:3–10. Apperson further testified that Blackwood and Patrick Mulvey (the Director of Marketing and Business Development in Engineering Plastics) corroborated these allegations. *See* Apperson Dep. at 377:14–378:7; 469:17–470:11.

Blackwood swears, however, that he does not recall ever telling Apperson that Fischer had problems in dealing with his personnel, or saying anything negative about Fischer's performance. *See* Blackwood Dep. at 43:11–24.

Apperson testifies that both Rosell and Robinson approached him with concerns over a request by Fischer that his subordinates complete a performance review of Fischer and return it to Fischer. Rosell and Robinson allegedly were concerned about the possibility of retribution from Fischer if the responses were unfavorable. *See* Apperson Dep. at 330:4–331:25; 335:2–12; 339:5–41:10.

Yet, Fischer, Rosell, and two other Fischer subordinates testify that Fischer did not attempt to coerce or threaten the members of his group into giving a positive review of

Fischer's performance. *See* Fischer Aff. ¶ 42; Pilotti Aff. ¶¶ 23–26; Gibson Aff. ¶¶ 25–27; Rosell Aff. ¶¶ 40–42. In addition, Rosell testifies that he never complained to Apperson about Fischer's conduct in connection with the review and that he told Apperson the review was a good idea. *See* Rosell Aff. ¶¶ 44–45. Rosell further testifies that he personally called most or all of Fischer's group to encourage the members to complete the survey favorably to Fischer. According to Rosell, none of the members expressed any concern to Rosell that Fischer was pressuring them to give a positive review. *See id.* ¶¶ 42–43.

As further support for his negative appraisal of Fischer's managerial skills, Apperson recounts another incident involving Fischer and a subordinate. Apperson swears that Robinson had described to him an incident in which Robinson had suggested that Allied participate in a program to donate power tools to victims of a hurricane in the Southeast. Robinson was unable to find Fischer at the time, so he approached Blackwood with the proposal. Apperson testifies that Fischer became enraged when he learned that Robinson had gone over his head, and threatened him with termination if it happened again. *See* Apperson Dep. at 341:10–344:5.

Finally, Apperson claims that his negative assessment of Fischer's managerial skills stemmed partly from an incident relayed to Apperson by Rosell, in which Fischer had handled himself inappropriately at a meeting with a large customer causing the customer to become upset, to ask Fischer to leave, and to tell Rosell never to bring Fischer with him on a sales call again. *See id.* at 326:7–327:14.

Rosell, however, testifies that the customer never requested that Fischer not attend such meetings. *See* Rosell Aff. ¶ 48. Additionally, Rosell swears that he did not tell Apperson, or anyone else at Allied, that the customer had made such a request. *See id.* at 49.

During his tenure as SI Manager, Fischer generally received high marks and praise for his work. *See* Fischer Aff. ¶ 39 and Ex. B. Fischer's performance reviews from 1991 to 1993, completed by Blackwood, were almost uniformly positive. *See* Fischer Aff. ¶ 40 and Ex. B. Fischer was rated highly both on his managerial skills and on the results he achieved. *See* Fischer Aff. Ex. B. On Fischer's performance review dated March 23, 1993, his final review at Allied, he received the highest possible overall rating. *See id.* Blackwood testifies that he felt his reviews of Fischer's work were accurate. *See* Blackwood Dec. at 39:16–23.

### D. TQ Facilitator

In addition to his duties as SI Manager, Fischer was a Total Quality ("TQ") Facilitator at Allied. Fischer volunteered for the position of TQ Facilitator in late 1991 and became a certified Facilitator during the first quarter of 1992. *See* Fischer Aff. ¶ 24. At that time, Fischer was told by Bill Gruebel, Blackwood's direct supervisor, that volunteering to become a TQ Facilitator would enhance Fischer's career and provide promotional opportunities for Fischer at Allied. *See id.* ¶ 26. Fischer received similar advice from Blackwood. *See id.* ¶ 27. In addition, all the Facilitators, including Fischer, received a memorandum from the CEO of Allied, L.A. Bossidy, which stated that volunteering to be a facilitator would help accelerate career growth. *See id.* Ex. A.

Service as a TQ Facilitator involved additional time and effort on Fischer's part for no direct or immediate monetary reward. The position required Fischer to take regular trips to New Jersey and participate both in the development of the TQ program and in the subsequent training program to become a Facilitator. *See id.* ¶ 29. In addition, the record reflects that Fischer was successful in his role as a TQ Facilitator. *See id.* ¶ 30 and Ex. B. According to an August 1992 Performance Appraisal completed by Blackwood, Fischer was "doing an excellent job" as a TQ Facilitator. *See id.* Ex. B.

### E. The Interviews

Fischer interviewed for five of the seven new managerial positions on April 29, 1993, with Apperson, Rose, and Jay Kaplan (the President of the Engineering Plastics Department). In early May; Apperson, Rose, Kaplan, and Mulvey met to discuss the results of the interviews and to select candi-

dates for the new positions. *See* Apperson Dep. at 475:10–476:17. Apperson testifies that at this meeting, the four men reached a quicker consensus about Fischer than about any other candidate. Apperson states that "the negative list overwhelmed the positive list on very serious issues." *Id.* at 487:16–18. The group determined that Fischer was not the right candidate for any of the positions for which he applied. *See id.* at 486:6–487:23.

## F. The Termination

Apperson advised Fischer on May 14, 1993, that his employment was to be terminated. *See* Fischer Dep. at 5:17–6:3. Allied informed Fischer, however, that he would be continued on the rolls as an active employee until August 31, 1993. In addition, Allied provided Fischer with salary continuation and payment for unused vacation through February 8, 1994. *See* Parliman Aff. Ex. H. Allied also continued Fischer's health coverage through February 8, 1994 and allowed him to keep his company car through that date. Finally, Allied provided Fischer with outplacement services.

In August 1993, Fischer was successful in obtaining new employment with a competitor of Allied, known as DSM. *See* Fischer Dep. at 29:3–14; 38:15–17. At the time of Fischer's termination from Allied, his salary was $88,000. His starting salary with DSM was $70,000. In January 1994, Fischer's salary at DSM increased to $75,000, and he received a $5,000 bonus in 1994. By 1996, his total compensation at DSM had increased to $94,725. *See* Fischer Dep. at 29:15–30:4.

## G. Lateral Placement Policy

Fischer claims that at the time Allied terminated his employment, Allied had a "lateral placement" policy, which the company neglected to follow in his case. The assertion that Allied had a lateral placement policy was corroborated by several of Fischer's co-workers in their affidavits. Fischer and the other Allied employees described this policy as follows:

> If an Allied employee was being terminated through no fault of his (or her) own (due to elimination of his or her position or other reasons not involving a failure to perform by the employee involved), Allied

would determine whether another position was open in Allied for which the employee was apparently qualified; if such a position was open, Allied would consider the employee for the open position; and if the employee was determined to be in fact qualified for such an open position, then Allied would hire such employee for such open position unless there was a more qualified internal candidate for such open position.

*See* Fischer Aff. ¶ 31; Rosell Aff. ¶ 7; Schlanger Aff. ¶ 7; Pierce Aff. ¶ 7; Gibson Aff. ¶ 10. Fischer, as well as the other employees who testified, do not assert that Allied documented this policy in a handbook or manual which Allied distributed to its employees. Rather, they base their understanding of the policy upon observation during their tenure as Allied employees and upon policy statements, presumably oral, by Allied management personnel. *See* Fischer Aff. ¶¶ 32–33; Rosell Aff. ¶¶ 6–8; Schlanger Aff. ¶¶ 6–8; Pierce Aff. ¶¶ 6–8; Gibson Aff. ¶¶ 11–12. Each of these employees had been working at Allied for over ten years, and all testified that employees at Allied were generally familiar with this lateral placement practice and relied upon this lateral placement practice. *See* Fischer Aff. ¶ 34; Rosell Aff. ¶ 9; Schlanger Aff. ¶ 9; Pierce Aff. ¶ 9; Gibson Aff. ¶ 13.

Rao is the only individual who testifies that the lateral placement policy was reflected in a written manual that was distributed to him. Rao cannot recall, however, the substance of the policy or where he had seen the policy. *See* Sabourin Aff. Ex. D at 109:16–111:3 ("Rao Dep."). Indeed, the record includes no written policy statement.

Nevertheless, Fischer testifies that Allied "kind of promised" to locate, and in good faith consider him for, other positions for which he was qualified pursuant to the company's lateral placement policy. Fischer clarifies that he did not intend to suggest that someone from Allied actually came to Fischer personally and made this promise to comply with the supposed lateral placement policy. Rather, Fischer claims that Allied "kind of promised" that it would comply with the lateral placement policy in that it was

standard to comply with the policy at Allied. *See* Fischer Aff. ¶ 35. Thus, according to Fischer, compliance was "kind of promised" to Fischer in the same way that compliance was promised to all employees who might be terminated through no fault of their own. *See id.*

The defendants deny that there was any definite, companywide lateral placement policy in place at the time of Fischer's termination. *See* Defs.' Br. at 26–27. In addition, Apperson and Rose both testify that there was no such policy, written or oral, in place in the Engineering Plastics Department. *See* Apperson Dep. at 428:23–429:12; Rose Dep. at 216:19–24.

### H.  Testimony of Rosell and Rao

Fischer claims that Apperson actually decided to terminate him prior to his interviews, and even prior to Apperson's initial meeting with Fischer on February 22, 1993. Rosell's testimony supports Fischer's claim. Rosell testifies that within two weeks of Apperson's hiring at Allied, Apperson and Rosell had dinner together. At that dinner, Apperson allegedly told Rosell that "Fischer was 'not an issue' and that [Rosell] should 'not worry about Rick Fischer anymore.'" *See* Rosell Aff. ¶¶ 59–60. In addition, Rao testifies that at a meeting in late March or early April 1993, Apperson identified Fischer as a target for termination. *See* Rao Dep. at 117:24–118:23.

In support of his allegation of age discrimination, Fischer cites to Rosell's and Rao's testimony. Rosell testifies that, at a lunch meeting, Kaplan, Apperson's direct supervisor, stated that the sales organization at Allied would be "younger' and more aggressive." Rosell Aff. ¶ 66. In addition, Rosell states in his affidavit that he heard Rose comment on one occasion that Allied needed to be " 'younger.' " *Id.* ¶ 67.

Rao testifies that Rose made an age-related comment in his presence. According to Rao, Rose inquired as to the age of a problem employee who was being discussed at a management resource review meeting. According to Rao, the participants of the meeting were discussing whether to terminate the employee. The employee in question had apparently been given many chances to improve his performance and had failed to do so. In the course of this discussion, Rose asked the employee's age. When the answer was given that he was over 40 years old, Rose reportedly commented that the employee had been given many opportunities and was unlikely to change now. According to Rao, Rose then suggested that Allied's efforts would better be invested in younger people. *See* Rao Dep. at 91:11–92:15.

Based on the above, Fischer contends that Allied predetermined to terminate his employment because of his age.

### I.  Fischer's Age

At the time of his termination in May 1993, Fischer was 39 years old. The employees selected to fill the five positions for which Fischer applied were: (1) Robert Welgos, 55 years old (Distributor/Compounder Manager); (2) Blackwood, 47 years old (West Regional Sales Manager); (3) Tim Fitzgerald, 40 years old (Furniture/EE Manager); (4) James Morelli, 38 years old (East Regional Sales Manager); and (5) Tim Dell, 32 years old (Lawn and Power Manager). *See* Parliman Aff. Ex. I. The average age of the five men selected to fill the positions for which Fischer applied was over 42 years old.

## II.  DISCUSSION

### A.  Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Where a summary judgment motion is properly made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). An issue of material fact is genuine if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lob-*

by, Inc., 477 U.S. 242, 248 , 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Olson v. General Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir.1996); *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993). Absent evidence sufficient to permit a jury to return a verdict for the non-moving party, there is no issue for trial and summary judgment must be granted. *See Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

**B. The Court Must Grant Summary Judgment in Favor of the Defendants on Fischer's Age Discrimination Claim**

Fischer alleges in Count I of his Complaint that Allied terminated him because of his age in violation of NJLAD. Fischer fails to offer any direct evidence of age discrimination. Furthermore, he fails to establish a *prima facie* case of age discrimination under NJLAD. Consequently, the defendants' motion for summary judgment will be granted on Count I of Fischer's Complaint.

**1. Fischer Fails To Offer Any Direct Evidence of Age Discrimination on the Part of the Defendants**

■ A plaintiff may proceed in an employment discrimination case by presenting either direct or circumstantial evidence of discrimination. To establish a direct evidence or mixed-motives case, a plaintiff must introduce "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1805, 104 L.Ed.2d 268 (1989); *see also Armbruster v. Unisys Corp.,* 32 F.3d 768, 778 (3d Cir.1994) ("the evidence required to come within the *Price Waterhouse* framework must directly reflect a discriminatory or retaliatory animus on the part of a person involved in the decisionmaking process."). "In a mixed-motives case the defendant condemns himself of invidious discrimination out of his own mouth or by his own overtly biased acts." *Hook v. Ernst & Young,* 28 F.3d 366, 374 fn. 3 (3d Cir.1994); *see also Starceski v. Westinghouse*

*Elec. Corp.,* 54 F.3d 1089, 1096 (3d Cir.1995) ("a charge on a 'mixed-motives' theory of employment discrimination requires 'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.'") (quoting *Ezold v. Wolf, Block, Schorr, and Solis–Cohen,* 983 F.2d 509, 522 (3d Cir.1992), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993)).

■ The Court may not grant summary judgment if an employee shows by direct evidence that there exists a genuine issue of material fact as to whether unlawful discrimination motivated an employment decision. *See Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1262 (D.N.J.1994), *aff'd.,* 67 F.3d 291 (3d Cir.1995).

■ Fischer has not offered any direct evidence that the decision by the defendants not to hire him for any of the five positions for which he applied was motivated by unlawful discrimination.

In support of his direct evidence argument, Fischer points to (1) Kaplan's comment that the sales organization at Allied would be younger and more aggressive and (2) Rose's statement that Allied needed to be younger. Neither of these statements, however, constitutes direct evidence that the defendants discriminated against Fischer based upon his age. Neither of the comments was directed at Fischer, nor did either contemplate Fischer. Indeed, there is no evidence that Kaplan or Rose even had Fischer in mind when they made these statements. Rather, the comments made by Kaplan and Rose were general in nature. As such, Fischer cannot rely on the comments as direct evidence of discrimination.[2]

The Court thus concludes that there is no direct evidence that the decisionmakers, namely Apperson, Rose, and Kaplan, were at all motivated by age discrimination in deciding to terminate Fischer's employment.

**2.** The fact that the five employees chosen to fill the positions for which Fischer applied were, on average, older than Fischer also belies Fischer's contention that he was not hired because Allied was seeking a sales organization which was, on the whole, younger.

### 2. Fischer Fails to Establish a Prima Facie Case of Age Discrimination Under NJLAD

In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the burden of proof and the analytical framework for federal employment discrimination claims where the plaintiff seeks to prove his case through circumstantial evidence. New Jersey courts have consistently utilized the *McDonnell Douglas* approach for analyzing discrimination claims under NJLAD. *See Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 550, 569 A.2d 793 (1990); *Clowes v. Terminix Intern., Inc.*, 109 N.J. 575, 595, 538 A.2d 794 (1988).

Under the procedure set forth in *McDonnell Douglas*, the plaintiff first bears the burden of proving by a preponderance of the evidence the elements required for a *prima facie* case. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Goodman v. London Metals Exchange, Inc.*, 86 N.J. 19, 31, 429 A.2d 341 (1981). To establish a *prima facie* case of age discrimination under federal law, a plaintiff must show that (1) he was in a protected group; (2) he was qualified for his position; (3) his employment nevertheless was terminated or he was not hired; and (4) his employer filled the position with someone sufficiently younger so as to create a legitimate inference of age discrimination. *See Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

NJLAD establishes slightly different elements of a *prima facie* case of employment discrimination. Under NJLAD, a plaintiff terminated from employment must show that (1) he was in a protected group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he nevertheless was fired; and (4) the employer sought someone to perform the same work after he left. *See Erickson*, 117 N.J. at 551, 569 A.2d 793. The *prima facie* elements under NJLAD are written generically to apply to any claim of discrimination. Thus, when discussing joint age discrimination claims under federal law and NJLAD, courts have routinely applied the more focused federal factors. *See Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65–66 (3d Cir.1996); *Retter v. Georgia Gulf Corp.*, 755 F.Supp. 637, 638 (D.N.J. 1991), *aff'd*, 975 F.2d 1551 (3d Cir.1992).

In discrimination in employment cases, the United States Supreme Court has emphasized that the core of a *prima facie* case of discrimination is evidence adequate to create an inference that an employment decision was based upon an illegal discriminatory criterion, such as age. *See Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). In this case, Fischer has failed to establish any inference of age discrimination, and thus has failed to establish a *prima facie* case.

Under NJLAD, to satisfy the first element of a *prima facie* case of employment discrimination, Fischer must show that he belonged to a protected class. Under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, written specifically to address age discrimination, the protected class includes any claimant who is at least 40 years of age at the time of the alleged discrimination. *See* 29 U.S.C. § 631(a). Yet, because NJLAD is written broadly to encompass all types of unlawful discrimination, it does not contain in its text a minimum age which a plaintiff must be in order to successfully maintain an age discrimination claim. Further, no published decision has explicitly established any such minimum age. Thus, if NJLAD is read literally, everyone, regardless of age, is in the protected class.

The Supreme Court recently held that "[a]s the very name 'prima facie case' suggests, there must be at least a logical connection between each element of the *prima facie* case and the illegal discrimination for which it establishes a [presumption]." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 878, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996). The first element of a *prima facie* case of age discrimination under NJLAD fails this test. Because everybody is in the protected class under NJLAD, the first element does not help in establishing an inference of age discrimination. Thus, the first element of a *prima facie* case of age

discrimination under NJLAD technically has no significance. The Court finds it hard to believe that the New Jersey Legislature intended such an illogical result.

■ The Third Circuit appears to agree and has implicitly read a 41 year old minimum into the requirements for a *prima facie* case of age discrimination under NJLAD. In *Lawrence*, 98 F.3d at 65, the Third Circuit emphasized that circumstantial age discrimination claims under the ADEA and NJLAD are governed by the same standards of analysis. The Court then held that the first element of a *prima facie* case of age discrimination is that the plaintiff "is over 40 years old." *See id.* The Court, however, did not distinguish, or discuss separately, the *prima facie* elements under the ADEA and NJLAD. *See id.* Thus, in seamlessly combining its analysis of age discrimination claims brought under both the ADEA and NJLAD, the Third Circuit implicitly established that the protected class under the two statutes is the same. Nevertheless, despite this interpretation of the implicit holding by the Third Circuit, the Court acknowledges that the Third Circuit was not faced with the narrow facts and singular claim before the Court today. The Court further acknowledges its own limitations in deciding issues of state law in the absence of state precedent. The Court therefore cannot hold that a plaintiff must be 40 years old at the time of termination to bring a claim of age discrimination under NJLAD. A plaintiff's age, however, is relevant in determining whether the facts of a case give rise to an inference of age discrimination.

As a separate element of his *prima facie* case of age discrimination, Fischer must prove that his employer filled the position he sought with someone sufficiently younger so as to create a legitimate inference of age discrimination. Although this is an element explicitly within only the ADEA analysis, several courts addressing NJLAD have relied on age differential as a factor of a plaintiff's *prima facie* case. *See id.* at 66; *Geldreich v. American Cyanamid Co.,* 299 N.J.Super. 478, 489–90, 691 A.2d 423 (App.

Div.1997); *cf. O'Connor,* 517 U.S. at ——-——, 116 S.Ct. at 1309–10.

In this case, Fischer applied for five jobs when he was 39 years old. Three of the jobs were filled by men older than Fischer (ages 40, 47, and 55), and the average age of the men who assumed the five jobs was greater than Fischer's age (42 versus 39). Of the two jobs filled by workers younger than Fischer, one was filled by a worker who was less than a year younger than Fischer and one was filled by a worker who was seven years younger than Fischer.

In his Complaint, Fischer claimed that his employment was terminated unlawfully and was motivated by age discrimination. Following the defendants' filing of their motion for summary judgment, however, Fischer altered his claim to focus solely on the fact that he was not hired for the position of Lawn and Power Manager due to age discrimination. Not surprisingly, this was the only position filled by an employee who was significantly younger (seven years) than Fischer.

Fischer essentially avers that this fact alone satisfies the *prima facie* case for age discrimination under NJLAD.[3] In support, Fischer relies upon *Geldreich,* 299 N.J.Super. 478, 691 A.2d 423, in which the New Jersey Appellate Division ruled that where the plaintiff was terminated and his job functions were assumed by three employees, one of whom was six years younger than the plaintiff and another of whom was 10 years younger, the plaintiff satisfied his *prima facie* case of age discrimination. In *Geldreich,* however, other facts supported an inference of age discrimination, namely that the plaintiff was 54 years old and that he was the only employee in his group to be discharged while the eight other, younger employees were all retained. *See id.* at 490, 691 A.2d 423.

■ As discussed above, the generic nature of the NJLAD *prima facie* elements undermine their utility as an analytical framework against which the Court can justly analyze whether an inference of age dis-

---

**3.** While the defendants argue that Fischer also fails to establish a *prima facie* case because he was unqualified for any of the five positions, the Court holds for purposes of this motion that Fischer has proven his qualifications by a preponderance of the evidence.

crimination exists from the facts of this case. Because NJLAD is written in general terms and is not written specifically to address age discrimination, the Court is guided by the teachings of *O'Connor* where the Supreme Court made it clear that a *prima facie* case of age discrimination must include evidence adequate to create an inference that an employment decision was based on age. *See* 517 U.S. at ——, 116 S.Ct. at 1310. Thus, the Court will look at the totality of the circumstances in order to determine if Fischer has plead facts which establish an inference of age discrimination. *See id.*

The undisputed facts show that Fischer applied for five positions, three of the five positions were filled by persons older than Fischer, and the average age of the persons selected was older than Fischer. At the time of termination, Fischer was 39 years old. Despite Fischer's attempts to center his claim solely on the one position that was filled by a significantly younger person, the Court views Fischer's situation in its entirety. The undisputed facts fail to establish any inference of age discrimination.

Although Fischer attempts to state a *prima facie* case under the general terms of NJLAD, the Court refuses to believe that the New Jersey Legislature would have intended for Fischer to have a viable cause of action based upon the undisputed facts of this case. As such, the Court is convinced that, presented with the same set of facts, the New Jersey Supreme Court would also conclude that Fischer has not established a *prima facie* case of age discrimination. Because he has failed to do so, the Court will grant the defendants' motion for summary judgment on Count I of Fischer's Complaint.

---

**4.** Rao claims that the lateral placement policy was contained in a written manual, but could not recall where he had seen it.

**5.** In Fischer's original Complaint, Fischer based his breach of contract claim partly on a layoff procedure which was contained in a policy manual distributed to employees in the Garrett Engines Division, a business unit of Allied's Aerospace Sector. In their brief, the defendants point out that this policy manual, entitled "Working Together at Garrett," applied only to workers employed at Allied's Garrett Engines Division, which was located in Arizona. Not only did Fischer never work in the Garrett Engines Divi-

### C. The Court Must Grant Summary Judgment in Favor of the Defendants on Fischer's Breach of Contract Claim

In Count II of his Complaint, Fischer alleges that Allied breached an implied contract of employment—the lateral placement policy; Fischer asserts that Allied had an established practice of assisting employees subject to layoff through no fault of their own in identifying open positions so that the employees, if qualified, could seek to be interviewed and considered for the positions. Fischer contends that, by reason of his termination, Allied breached this implied contract. Because no such contract existed, Fischer's breach of contract claims must be dismissed.

Fischer has not identified nor produced any written policy upon which he bases his claim for breach of contract. In fact, Fischer, along with several other Allied employees, admit that they have never seen such a written policy.[4] Rather, Fischer's claim is based upon an alleged practice whereby, according to Fischer, Allied "kind of promised" to identify open positions for him in the event of a reduction-in-force.[5]

The fact that Fischer is unable to produce any written evidence of a lateral placement policy, however, is not dispositive of his claim for breach of an implied contract. Limiting enforcement solely to policies which are written would permit an employer to maintain unwritten employment policies and apply them in a selective and disparate manner. *See Gilbert v. Durand Glass Manufacturing Co., Inc.*, 258 N.J.Super. 320, 329, 609 A.2d 517 (App.Div.1992). This would allow an employer to obtain the benefits of an

---

sion, he did not even work in Allied's Aerospace Sector.

Fischer appears to have conceded that this layoff procedure was inapplicable to him. In his brief, Fischer focuses solely on his claim that there was an implied contract between Allied and him based upon Allied's allegedly well-established lateral placement policy. He makes no further mention of the Garrett policy manual or the layoff procedure.

The Court agrees with the defendants that the policy manual used by the Garrett Engines Division is irrelevant in this case, and the Court will therefore not address the layoff policy contained therein.

unwritten policy ("[an] orderly, cooperative and loyal work force") without burdening the employer with any enforceable contractual obligations. *See id.* at 329–30, 609 A.2d 517. Therefore, it is possible for a plaintiff to successfully maintain a breach of implied contract claim based solely upon the oral representations of an employer.

In order to establish an oral implied employment contract, a plaintiff must show: (1) that the oral employment policy contained "an express or implied promise concerning the terms and conditions of employment"; (2) that the policy was "a definitive, established, company-wide policy"; (3) that the oral statement of policy by a supervisor constituted an "accurate representation of policy"; and (4) that the supervisor was "authorized to make" the oral statements of policy. *See Ditzel v. UMDNJ*, 962 F.Supp. 595 (D.N.J.1997) (quoting *Gilbert*, 258 N.J.Super. at 330–31, 609 A.2d 517).

Here, there is no evidence of a "definitive, established, company-wide policy." Instead, there are only Fischer's statements concerning what Allied supposedly "kind of promised," and the statements of his affiants that assert the existence of a lateral placement policy, but specify no source for their understanding of the policy. This evidence cannot meet the threshold standard under *Gilbert*.

In addition, Fischer has not provided any evidence that the lateral placement policy was disseminated in an oral policy statement, accurate or otherwise, made by a supervisor. Instead, Fischer, and the other employees who testified, appear to base their under-standing of the lateral placement policy solely upon their own observations during the course of their tenure at Allied. They do not point to any specific oral policy statement made by any supervisor. The employees do make a vague and unsubstantiated reference to policy statements allegedly made by Allied; they do not, however, specify the content of these policy statements, the manner in which the policy statements were disseminated, or the source of the policy statements. Furthermore, Allied denies that any such lateral placement policy existed, and Apperson and Rose both testify that the Engineering Plastics Department had no such policy or practice. The observations of Fischer and the other testifying employees are not sufficient to show that the lateral placement policy was an accurate representation of company policy as conveyed by a supervisor.[6]

Fischer has failed to provide any evidence to create a genuine material issue of fact as to the existence of an implied contract.[7] Therefore, the Court must grant the defendants' motion for summary judgment on Count II of Fischer's Complaint.[8]

## D. The Court Must Grant Summary Judgment in Favor of the Defendants on Fischer's Promissory Estoppel Claim

In Count III of his Complaint, Fischer alleges a claim of promissory estoppel. Fischer asserts that Allied should be promissorily estopped from terminating his employment because of statements allegedly

---

6. The Court need not reach the final prong of the *Gilbert* test. Because Fischer has not identified any specific policy statement made by a supervisor, it is clearly impossible to determine if a supervisor was authorized to make such a statement of policy.

7. Fischer also claims breach of an implied covenant of good faith and fair dealing. For the same reasons that Fischer is unable to establish the existence of an implied employment contract, his claim for breach of an implied covenant of good faith and fair dealing also fails. "In the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." *Noye v. Hoffmann–La Roche, Inc.*, 238 N.J.Super. 430, 434, 570 A.2d 12 (App.Div.), *certif. denied,* 122 N.J. 146–47, 584 A.2d 218 (1990).

8. The defendants also point to Fischer's signed employment application and other documents distributed to Fischer by Allied which contain statements that appear to suggest that Fischer was an at-will employee. The Court need not, however, address the significance of these documents. In the absence of some express or implied contract, every employee relationship in New Jersey is deemed to be at-will and subject to termination at any time and without limitation. *See Bernard v. IMI Sys., Inc.*, 131 N.J. 91, 106, 618 A.2d 338 (1993). Since there was no express or implied contract which modified Fischer's at-will employment, the application and the other documents are irrelevant.

made by various Allied officials that becoming a TQ Facilitator would enhance Fischer's career. Because these representations cannot, as a matter of law, be understood to have constituted any definite promise of continued employment for an indefinite term, Fischer's promissory estoppel claim must be dismissed.

Quasi-contractual liability such as promissory estoppel is based on the equitable principle that a person should not be allowed to enrich himself unjustly at the expense of another. *See Shalita v. Township of Washington,* 270 N.J.Super. 84, 90, 636 A.2d 568 (App.Div.1994).

Under New Jersey law, the elements of a promissory estoppel claim are: (1) a clear and definite promise; (2) the promise is made with the expectation that the promisee will rely on it; (3) the promisee in fact reasonably relies on the promise; and (4) the promisee suffers a definite and substantial detriment as a result of the reliance such that the promise should be enforced to avoid injustice. *See Royal Assocs. v. Concannon,* 200 N.J.Super. 84, 91, 490 A.2d 357 (App.Div. 1985).

In support of his promissory estoppel claim, Fischer relies upon the advice he allegedly received from Blackwood and Gruebel that becoming a TQ Facilitator would enhance Fischer's career and provide promotional opportunities for Fischer at Allied. In addition, Fischer relies upon the memorandum distributed to all TQ Facilitators from the CEO of Allied which stated that becoming a TQ Facilitator would help accelerate career growth. Fischer apparently contends that these statements should bar Allied from selecting him for termination during a reorganization.

In fact, these alleged promises are too vague to constitute the basis for a promissory estoppel claim. The statements promise neither to protect Fischer from termination, nor to immunize him from the effects of a reorganization. The statements cited by Fischer do not constitute a clear and definite promise, as required by New Jersey law, and any reliance by Fischer on those statements was unreasonable.

Because Fischer cannot show the existence of any clear and definite promise guarantee-ing him continued employment with Allied, his claim for promissory estoppel must fail. Accordingly, the Court will grant the defendants' motion for summary judgment on Count III of Fischer's Complaint.

## III. CONCLUSION

For the reasons expressed herein, the Court will grant the defendants' motion for summary judgment.