

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-1998

# Newport Assoc Dev v. Travelers Indemnity

Precedential or Non-Precedential:

Docket 97-5527

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"Newport Assoc Dev v. Travelers Indemnity" (1998). *1998 Decisions.* Paper 287.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/287

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 29, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5527

NEWPORT ASSOCIATES DEVELOPMENT COMPANY;
NEWPORT MARINE HOLDING, INC.,
        Appellants

v.

THE TRAVELERS INDEMNITY COMPANY OF ILLINOIS;
FRENKEL & CO., INC.

FRENKEL & CO., INC.,
        Defendant/Third-Party Plaintiff

v.

INDUSTRIAL RISK SPECIALISTS, INC.,
        Third-Party Defendant

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 94-cv-01514
(Honorable John W. Bissell)

Argued November 5, 1998

Before: SCIRICA and ALITO, Circuit Judges,
and GREEN, District Judge*

(Filed December 29, 1998)

_____

*The Honorable Clifford Scott Green, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

SHELDON M. FINKELSTEIN,
ESQUIRE (ARGUED)
Hannoch Weisman
4 Becker Farm Road
Roseland, New Jersey 07068-3788

 Attorney for Appellants

HARRY ROBINSON, III, ESQUIRE
(ARGUED)
Gennet, Kallmann, Antin &
 Robinson
6 Campus Drive
Parsippany, New Jersey 07054

 Attorney for Appellee,
 The Travelers Indemnity Company
 of Illinois

OPINION OF THE COURT

SCIRICA, Circuit Judge.

Newport Associates Development Company and Newport Marine Holding, Inc. ("Newport") appeal the District Court's grant of summary judgment in favor of The Travelers Indemnity Company of Illinois ("Travelers").1 The District Court held that the insurance policy issued by Travelers to Newport unambiguously did not cover a breakwater owned by Newport. We will affirm.

I.

Newport is a subsidiary of the LeFrak Organization,

_____

1. The District Court granted Travelers' summary judgment motion in an order dated March 22, 1995. Claims against Frenkel & Co., Newport's broker, remained pending at that time. Those claims were later settled, and upon motion of Frenkel and Newport, the court entered an order finalizing its March 22, 1995 order. We have jurisdiction under 28 U.S.C. S 1291. The District Court had diversity jurisdiction under 28 U.S.C. S 1332 following this action's removal from New Jersey state court.

which has been involved for several years in the development of the Jersey City waterfront. This development includes the Newport Marina ("the marina"), managed by another LeFrak Organization subsidiary, Mid-State Management Corporation. The marina contains various buildings, docks, berths for boats, and a breakwater. The breakwater is located about 120 feet from the dock's end and is designed to limit wave action in the area in which the boats are moored.

In early 1990, Mid-State Management Corporation hired an independent insurance broker, Frenkel & Co., Inc. ("Frenkel"), to procure an insurance policy for the marina. Michael Feinstein of Frenkel met several times with Newport employee Arthur Klein to discuss the scope of coverage under the proposed policy. Feinstein also visited the marina on April 9, 1990 and took photographs of the site. Ultimately, Feinstein drafted a policy containing, in part, the following language:

> Buildings and Structures: [for the amount of] $600,000
>
> Concrete Pier, under buildings [and structures]: [for the amount of] $1,750,000
>
> Slips, consisting of metal slips, walkways, ramps, pilings, power cables and other integral parts collectively called "slips": [for the amount of] $2,000,000.
>
> Business Interruption: [for the amount of] $300,000
>
> all as defined in forms attached hereto and located as indicated or subsequently reported to and agreed to by The Travelers. In no event shall liability exceed any specific sublimit shown in this policy for any insured loss, coverage or location(s).

In his deposition, Feinstein stated he always intended to cover "everything in the water" under the insurance policy and he believed the phrase "and other integral parts" would include a breakwater. However, Feinstein acknowledges he was not aware of the existence of the breakwater at the time he drafted the policy. Nor could Arthur Klein recall whether he specifically instructed Feinstein to include the breakwater.

3

Feinstein submitted his draft of the policy to Travelers and another insurer, Chubb Insurance Company. Feinstein also submitted photographs of the marina, taken on April 9, 1990, as well as a map that described the marina and showed the breakwater. Travelers issued an insurance policy incorporating verbatim Feinstein's description of the slips, but the policy did not incorporate the map or photographs. Newport purchased the policy from Travelers to provide coverage for the marina from February 1, 1992 to February 1, 1993.

In December 1992, the breakwater was severely damaged by a storm. Newport submitted a claim for damages under the policy. Travelers denied the claim, stating that the slips insured did not include the breakwater, and Newportfiled suit for breach of contract. The District Court found that the policy unambiguously did not cover the breakwater and accordingly entered summary judgment in favor of Travelers.

II.

On appeal from the grant of summary judgment, we review the evidence de novo and in the light most favorable to the nonmoving party. See Antol v. Perry, 82 F.3d 1291, 1294-95 (3d Cir. 1996). We apply the same test as the district court: that is, we determine "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." Id. at 1295. We will affirm a grant of summary judgment in a breach of contract action only where the contract is unambiguous and the moving party is entitled to judgment as a matter of law. See Tamarind Resort Assocs. v. Government of Virgin Islands, 138 F.3d 107, 111 (3d Cir. 1998). There is no dispute that New Jersey insurance and contract law governs in this case.

Under New Jersey law, the words of an insurance contract should be given their everyday and common meaning. See Longobardi v. Chubb Ins. Co., 582 A.2d 1257, 1260 ( N.J. 1990) ("[T]he words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained

4

construction to support the imposition of liability."). The test for ambiguity is whether the policy's phrasing is "so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo v. Stone-E-Brick, Inc., 405 A.2d 788, 795 (N.J. 1979). Whether the contract terms are clear or ambiguous is a question of law. See Sumitomo Mach. Corp. v. Alliedsignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996) (applying New Jersey law); Nester v. O'Donnell, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997).

In determining whether a contract is ambiguous, a court "must `consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings.' " Pennbarr Corp. v. Insurance Co. of N. Am., 976 F.2d 145, 151 (3d Cir. 1992) (applying New Jersey law) (quoting International Union, UAW v. Mack Trucks, Inc., 917 F.2d 107, 111 (3d Cir. 1990)). If the nonmoving party presents a reasonable alternative reading of the contract, then a question of fact as to the meaning of the contract exists which can only be resolved at trial. See Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987); Landtect Corp. v. State Mut. Life Assurance Co., 605 F.2d 75, 80 (3d Cir. 1979). Thus, the dispositive question is whether Newport provided a reasonable reading of the contract, raising a question of fact as to the meaning of the contract and requiring resolution at trial.

The insurance policy in this case covers, inter alia, "[s]lips, consisting of metal slips, walkways, ramps, pilings, power cables and other integral parts collectively called `slips.' " The parties dispute whether the breakwater falls within this provision. Travelers argues that the paragraph applies only to slips and their physically attached, component parts. Newport urges that the phrase "other integral parts" covers the breakwater because a breakwater is functionally necessary to the operation of the slips.

The District Court held that the policy language unambiguously does not cover the breakwater. The court reasoned:

> All objective indicia demonstrate that this text is
> unambiguous and must be construed as Travelers
> argues.

5

(1.) A breakwater is not a slip or berth for a vessel.

(2.) In the specific definition of "slips" in the policy, all specifically listed components of that term which immediately precede the phrase "and other integral parts" are (by description and reasonable construction at least) physically attached to the structures in which the boats are berthed. Accordingly, it is reasonable to construe the phrase "and other integral parts" as being consistent in nature with its specific antecedents. The unattached breakwater, forty yards out into the Hudson River, serving a function very different from the slips (or "slips"), could not under any reasonable expectation of the parties at the time of contracting be included as an "other integral part" covered by the insurance policy.

(3.) Dictionary definitions of "integral parts" connote component "parts which together constitute a whole." The Random House Dictionary (unabridged ed. 1967). The excerpt from the Random House Pocket Dictionary which Feinstein consulted is not inconsistent. A breakwater is not such a part of the structure where vessels are berthed.

Newport Assocs. Dev. Co. v. Travelers Indem. Co., No. 94-1514, slip op. at 11 (D.N.J. Mar. 21, 1995). Therefore, the District Court concluded, "The only reasonable construction of the terminology is that the breakwater lying offshore from the vessel berthing structure was not an `integral part' thereof and hence covered as part of the `slips' as defined in that policy." Id. at 12.

We agree with this construction of the language. As the New Jersey Supreme Court has made clear, words in an insurance contract should be given their everyday meaning. See Longobardi, 582 A.2d at 1260. Here, the policy language refers to "slips" and "other integral parts" of slips, such as "walkways," "ramps," "pilings," and "power cables." These parts are all physically attached components of the slips themselves, whereas the breakwater is an entirely separate structure located 120 feet from the end of the dock in the Hudson River. Common sense suggests that the term "other integral parts" was meant to refer not to the

6

breakwater, but to the various component parts of the slips that could not be exhaustively identified by name. We believe this interpretation is the only one consistent with the provision's references to "slips, walkways, ramps, pilings, [and] power cables."

Newport cites Zanfagna v. Providence Wash. Ins. Co., 415 A.2d 1049 (R.I. 1980) for the proposition that an item need not be physically attached to the insured property to be considered an "integral part." In Zanfagna, the disputed items were "electrical fixtures, appliances and interior doors that at the time of the theft were being temporarily stored in a garage while awaiting incorporation within the main structure." 415 A.2d at 1051. Thus, the items in question were physical components that simply had not yet been incorporated. In this case, however, the breakwater was an entirely separate structure that was never to be integrated into the insured property.

Newport also argues the policy language must be construed in light of extrinsic evidence purportedly showing that the parties intended the breakwater to be covered. We agree that extrinsic evidence is relevant to determining whether ambiguity exists. See, e.g., American Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181 (3d Cir. 1995). However, "the focus must remain on the language chosen by the parties, and a text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently." Id. at 182.

Newport cites as extrinsic evidence of coverage the photographs sent to Travelers which depict, in the background of some photographs, parts of the breakwater (as well as a diagram depicting but not labeling the breakwater) and the statement of Mr. Feinstein that he "intended" to cover everything in the water. This evidence is weak at best. The map and photographs were not incorporated into the policy. The mere presence of an item in a map or photograph that the insurer saw is not enough to place it within the realm of coverage when there is no textual support for coverage in the policy itself.

7

Similarly, Mr. Feinstein's statement that he intended the policy to cover "everything in the water" is unpersuasive. As the District Court noted, this statement was made only after litigation ensued. Indeed, "Feinstein did not know about the breakwater at the time he drafted the policy language and there is no evidence that he discussed it with anyone from Newport at that time." Newport, slip op. at 12. Moreover, it is "undisputed that the inclusion of the breakwater in the policy language was not expressed to Travelers either orally or in writing." Id.  If the parties had intended the breakwater to be included, they could have used the unambiguous term "breakwater" in the policy. They did not do so.

Far from causing a reasonable fact finder to "understand the text differently," American Cyanamid, 54 F.3d at 182, the extrinsic evidence fully supports the District Court's construction of the policy. Consequently, we agree with the District Court that the policy unambiguously excluded the breakwater from coverage.

III.

Newport also invokes the doctrines of "reasonable expectations" and "contra preferentum" in its argument for reversal. We believe those doctrines are inapplicable here. The doctrine of reasonable expectations states that an insurance contract generally is to be construed "so as to fulfill the reasonable expectations of the insured." Werner Indus., Inc. v. First State Ins. Co., 548 A.2d 188, 191 (N.J. 1988); see also Sparks v. St. Paul Ins. Co., 495 A.2d 406, 412 (N.J. 1985) (same). As a result, where language in an insurance contract is ambiguous, courts usually will construe the language in favor of the insured. See, e.g., Nationwide Mut. Fire Ins. Co. v. Pipher, 140 F.3d 222, 227 (3d Cir. 1998) (noting that ambiguous terms "should be construed against [insurer] so as to provide coverage to its insured"); Doto v. Russo, 659 A.2d 1371, 1376 (N.J. 1995) ("New Jersey courts often have construed ambiguous language in insurance policies in favor of the insured and against the insurer."); Mazzilli v. Accident & Casualty Ins. Co., 170 A.2d 800, 803 (N.J. 1961) ("If the controlling language of the policy will support two meanings, one

8

favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied.").

As discussed supra, the policy language in this case was unambiguous. Accordingly, we do not find it necessary to inquire whether Newport reasonably expected that the breakwater was covered by the policy. But we note that with the exception of an after-the-fact statement by Mr. Feinstein, who was not even aware of the breakwater's existence when he drafted the policy, there is no evidence that anyone believed the breakwater was covered by the policy. The policy of liberally construing insurance contracts cannot override the plain language of the text and the absence of extrinsic evidence supporting Newport's position. As the New Jersey Supreme Court has held, "[a]lthough Courts should construe insurance policies in favor of the insured, they should not write for the insured a better policy of insurance than the one purchased." Longobardi, 582 A.2d at 1260 (quoting Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 562 A.2d 208, 214 (N.J. 1989)).

Newport also relies on the doctrine of "contra preferentum," which states that "as between two reasonable and practical constructions of an ambiguous contractual provision . . . the provision should be construed less favorably to that party which selected the contractual language." United States v. Seckinger, 397 U.S. 203, 216 (1970). According to Newport, the insurance policy should be construed against Travelers because Travelers selected the policy language and "Frenkel [Feinstein's company] acted as, if anything, Traveler's broker." (Appellant's Reply Br. at 3.) But this contention is belied by Newport's own statement describing Frenkel's role as a middleman: "As an insurance broker, Frenkel was `one who act[ed] as a middleman between the insured and the insurer, and who solicit[ed] insurance from the public under no employment' from any specific insurance company." (Appellant's Br. at 4-5 (quoting Boulton Agency, Inc. v. Phoenix Worldwide Indus. Inc., 698 So.2d 1248, 1250 (Fla. Dist. Ct. App. 1997)).

In fact, Feinstein met with Newport's employee Klein several times to discuss the scope of insurance coverage to

be purchased, and Feinstein acted at Klein's direction while drafting the policy. The District Court found that Feinstein was not the agent of Travelers, but of Newport:"Newport had its broker [Feinstein] draft and describe the items to be included under the Travelers' policy. This broker represented his client, Newport." Newport, slip op. at 8 (citation omitted).

Regardless of whether Feinstein's role is better characterized as a middleman or as Newport's agent, the crucial fact is that Travelers did not unilaterally impose the policy on Newport. As we recently observed in a case applying New Jersey insurance law, the doctrine of contra preferentum is based on the fact that "insurance contracts are in most instances `nonnegotiable' " since they tend to be drafted solely by the insurance industry. Pittston Co. v. Allianz Ins. Co., 124 F.3d 508, 521 (3d Cir. 1997). When a contract is drafted by the insured or jointly negotiated, the doctrine does not apply:

> [T]he dispositive question is not whether the insured is a sophisticated corporate entity, but rather whether the insurance contract is negotiated, jointly drafted or drafted by the insured. In such instances, we conclude that the doctrine of contra preferentum should not be invoked to inure to the benefit of the insured.

Id. Here, the insurance policy was drafted by an independent broker who was hired by Newport and acted in consultation with Newport employees. The drafted policy was then shopped to at least two different insurance companies. Newport selected Travelers after reviewing its proposed policy, and Travelers adopted the broker's policy language without any changes to the provisions at issue. Under these circumstances, we believe the contract was either drafted by Newport or jointly drafted, and the doctrine of contra preferentum does not operate in Newport's favor.

IV.

Accordingly, we will affirm the judgment of the District Court.

10

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit