In re BIDERMANN INDUSTRIES
U.S.A., INC., f/k/a Blackstone,
Inc., et al., Debtors.

Bankruptcy Nos. 95 B 43098(TLB), 95
B 43099(TLB), 95 B 43101(TLB)
to 95 B 43114(TLB).

United States Bankruptcy Court,
S.D. New York.

Nov. 2, 1999.

Tenzer Greenblatt LLP, Attn: Harris N. Cogan, New York City, for debtors in Possession.

Stevens & Lee, P.C., Attn: Robert Lapowsky, Wayne, Pennsylvania, for debtors in Possession.

Ravin, Greenberg & Marks, P.A., Attn: Allan M. Harris, Roseland, New Jersey, for Stay Bonus claimants.

### DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEBTORS' MOTION FOR SUMMARY JUDGMENT

TINA L. BROZMAN, Chief Judge.

***Introduction***

Bidermann Industries U.S.A., Inc., Bidermann Industries Corp. and certain of their direct and indirect subsidiaries (collectively, "Bidermann" or "the Debtors") engaged in the design, manufacture, merchandising and distribution of men's and women's apparel products both domestically and abroad. Among their divisions was Ralph Lauren Womenswear ("RLW"), which, during the course of their chapter 11 cases, was sold to Polo Ralph Lauren Enterprises L.P. ("Polo"). Many of the employees from RLW were offered employment with Polo. In contemplation of the closing of the contract of sale, Bidermann obtained court approval for and implemented a stay bonus program potentially affecting 111 employees whose jobs with the Debtors would be terminated. The aim was to ensure a smooth transition by inducing employees to remain with Bidermann until a specified date.

Thirty-eight former Bidermann employees (collectively, the "Claimants") filed administrative expense claims seeking payment in the aggregate amounts of $527,112.93 under the enhanced retirement benefit program of Bidermann's Pension Plan and $223,909.54 under the stay bonus program. Following Bidermann's objection thereto, discovery ensued. At the conclusion of discovery, Bidermann filed a motion for summary judgment seeking expungement of the Claimants' claims.

*Background*

Prior to the commencement of its chapter 11 proceedings, and anticipating that the reorganization and downsizing of the company might involve the sale of one of its subsidiaries as well as layoffs of employees, Bidermann amended its Retirement Income Plan on July 6, 1995 to provide for an enhanced retirement program. *See* Affidavit of Steven J. Kaufman, sworn to on January 14, 1999, at ¶ 5, to be referred to as "Kaufman Aff. at ____." The amendment provided, in pertinent part, that a participant in the Bidermann Retirement Income Plan would be eligible for an enhanced retirement benefit if "the Termination of Employment is not the result of the sale of the stock or assets of an Employer or a division thereof if the purchaser offers continued employment to the Participant on substantially the same terms and conditions as in effect immediately prior to such sale."[1] *See* Bidermann's Summary Judgment Motion, Exhibit E. In a July 10, 1995 memorandum (the "July 10th Memorandum") distributed to its employees, Bidermann explained that:

[t]o qualify for this special benefit, you must have worked at least 1000 consecutive hours as of July 1, 1995 and be a

Plan Participant (i.e. have at least 1 year and 1 month service) on the date your employment was terminated.... If your employment is terminated for any other reason, including if you resign in anticipation of your job being eliminated, you will not be eligible for this benefit. Also if you work for a subsidiary which is sold and the purchaser offers continued employment, you will not be eligible for this benefit.

*See* Bidermann's Summary Judgment Motion, Exhibit F. In a July 17, 1995 memorandum ·(the "July 17th Memorandum") distributed to its employees at the Secaucus location, Bryan P. Marsal, President and Chief Executive Officer of Bidermann, stated that:

We do not expect massive layoffs as a result of this reorganization, and the Company is not going out of business. However, as part of our turnaround plan, we are moving to decentralize the management of the Company to improve productivity and reduce operating costs—which will result in the elimination of certain jobs. The positions that will be affected are located mainly at the Secaucus office and distribution center. Certain Secaucus employees will be of-

---

1. Although Claimants initially argued that they had a contractual claim for enhanced retirement benefits following termination of their employment with Bidermann on the theory that the terms and conditions of their employment with Polo were not substantially the same as with Bidermann, they withdrew this argument at the initial hearing held on June 2, 1998 to consider their motion for payment of administrative expenses. To the extent that Claimants now seek to raise this argument in opposition to Bidermann's summary judgment motion, they are precluded from so doing. Even addressing the merits of their argument, however, the Claimants would not prevail because the benefits offered were reasonably comparable. *See Boss v. Advanstar Communications, Inc.,* 911 F.Supp. 109 (S.D.N.Y.1995) (court denied plaintiff's claim for severance, finding that the nature, terms and conditions of her new employment were "reasonably comparable" to those of her prior employment.) Not only did Polo offer Claimants the same salaries they received from Bidermann, but they were also provided with service credit so that they would be eligible to immediately participate in Polo's benefit programs, including Polo's 401(k) Profit Sharing Retirement Savings Plan and medical and dental insurance plans. (*see* Exhibit A to Shari B. Kibel's Affidavit, sworn to February 4, 1999). Therefore, Claimants failed to demonstrate that the terms and conditions of their employment with Polo are not substantially the same as the terms and conditions of their employment with Bidermann and are not entitled to enhanced retirement benefits. Notwithstanding the waiver of this argument, Claimants have not withdrawn their claims for the value of such benefits based on theories of breach of fiduciary duty, fraud and estoppel and for the stay bonus based upon breach of contract theories. Because Claimants' breach of contract claim for the enhanced retirement benefits is no longer available, I need not reach the issue of whether Claimants exhausted their available administrative remedies under the pension plan.

fered positions at other locations, including the New York corporate office. Others will be asked to stay for a certain length of time to assist with the transition. Those who are not asked to remain will receive separate packages in accordance with company policy.

*See* Opposition of Stay Bonus Claimants, Exhibit M. Two memoranda by authorized personnel of Bidermann, each dated August 4, 1995, were addressed to specific employees. One memorandum advised of the closing of the Secaucus facility and the anticipated layoffs of most employees by year end.[2] The second memorandum informed the named employee that his or her position was eliminated "as certain responsibilities performed by the Corporate staff are transferred to the operating divisions" and that "[o]ut of recognition of your contributions to the Company, and in order to make this transition as smooth as possible for the affected employees, Bidermann is applying for approval with the Bankruptcy Court to implement a Stay Bonus program." *See* Opposition of Stay Bonus Claimants, Exhibit I.

Later that same month, Bidermann entered into the agreement with Polo for the purchase of RLW. *See* Opposition of Stay Bonus Claimants, Exhibit N; Transcript of Deposition Testimony of Steven J. Kaufman, at page 28, to be referred to as "Kaufman at ___." Two months after the commencement of their bankruptcy cases, the Debtors requested Bankruptcy Court authorization to implement a Stay Bonus program and to make payments to certain employees under the program (the "Stay Bonus Motion"). The motion did not pertain to enhanced retirement benefits. In paragraphs 17 and 18 of the Stay Bonus Motion, the Debtors stated that:

> Shortly prior to and continuing since the inception of these cases, the Debtors have undertaken long-range efforts to reduce unnecessary costs and to streamline operations. As part of this process, the Debtors, among other things, have determined to eliminate, commencing on August 30, 1995 and continuing through March 30, 1996, at least one-hundred and eleven (111) of those positions (possibly more) now held by the corporate staff at the Secaucus and New York locations. Regrettably, a necessary byproduct of the Debtors' streamlining and cost-cutting efforts at the Locations is the unfortunate loss of jobs by loyal employees. In full recognition of the dedication and contribution of these employees over the years, and in order to make this consolidation and transition effort run as smooth as possible, the Debtors have decided to implement a stay bonus program for the benefit of those 111 employees whose positions have been or will be eliminated.

However, in paragraph 19 of the Stay Bonus Motion, the Debtors stipulated that

> [a]s a pre-condition to receiving benefits under this program, such employee must continue in the employ of the company up through their actual date of termination, and must sign a general waiver and release agreement. In the event any employee voluntarily resigns prior to their actual date of termination, such employee will be deemed to forfeit, and will forfeit, all payments contemplated to be made under the Stay Bonus Program.

Attached to the Stay Bonus Motion was a list of 111 employees whose positions, according to the Debtors, had been or were to be eliminated. Many of the Claimants appeared on this list. *See* Opposition of Stay Bonus Claimants, Exhibit E. An order authorizing the Debtors to implement the stay bonus program and deeming payments to be made thereunder as adminis-

---

**2.** The August 4, 1995 memorandum from J. Andrew Bolt to Georgeann Jaslow refers to an attached "list of job titles and positions affected and the number of employees in each classification." Although the Claimants annexed a copy of this memorandum as Exhibit C to their opposition to Bidermann's summary judgment motion, the attached list was not included.

trative priority expenses under section 503(b) of the Bankruptcy Code was signed on September 18, 1995.

In a memorandum dated October 11, 1995 (the "October 11th Memorandum"), which Bidermann had individually addressed to certain employees who had not yet received notification of whether Polo would offer them employment, the employees, including many of the Claimants, were advised that:

> [t]he Polo organization is still deciding what functions they need to establish and you may be offered employment with Polo within the next few weeks. If you are not offered a position with Polo, we regret to inform you that your position with Bidermann will be eliminated, effective December 15, 1995. Out of recognition of your contributions to the Company, and in order to make this transition as smooth as possible for the affected employees, Bidermann has received approval from the Bankruptcy Court to implement a Stay Bonus program. Under this program, you would receive … a total payment which includes a stay bonus … plus an Enhanced Retirement Program separation benefit. According to the terms of these programs, you must continue to work until the above date in order to receive the Stay Bonus and the Enhanced Retirement separation benefit.

*See* Bidermann's Summary Judgment Motion, Exhibit G; Opposition of Stay Bonus Claimants, Exhibit G.

Two weeks later, Bidermann, in connection with the sale of RLW, and needing to assure the continued smooth operation of RLW's Secaucus warehouse facility with experienced personnel, executed a services agreement with Polo by which Bidermann's employees would continue to provide such services at a cost to be borne by Polo. *See* Opposition of Stay Bonus Claimants, Exhibit D. In the midst of the Secaucus facility closing, the streamlining of the Debtors' operations, the uncertainty of employees receiving an offer of employment with Polo, and the different times at which many of them did, it is undisputed that several Claimants had discussed with certain supervisory corporate personnel of Bidermann their eligibility for a stay bonus and an enhanced retirement benefit.

### The Claimants

The Claimants consist of three groups: (i) twenty-one Bidermann corporate employees who received the October 11th Memorandum and claim that they are eligible for a stay bonus (collectively, the "Group A Claimants"); (ii) three Bidermann corporate employees and three RLW employees who did not receive the October 11th Memorandum, but claim there was an oral promise of benefits by supervisory corporate personnel of Bidermann (collectively, the "Group B Claimants"); and (iii) ten RLW and one Bidermann employee who did not receive any written or oral offer of employment or promise of benefits, but claim that they were entitled to benefits as a matter of company policy because they were terminated by Bidermann (collectively, the "Group C Claimants") [3].

### Discussion

Bankruptcy Rule 7056 which incorporates Fed.R.Civ.P. 56 ("Rule 56") provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affi-

---

**3.** The Group A Claimants include Gloria Arcuri, Jimmy Azziz, Josie Bartolo, Patricia Corrals, Marina Cortes, Frank Esposito, Laura Greico. Georgeann Jaslow, Betty Jiminez, Pauline Jiminez, Annie McAuley, Anna Martin, Maria Martinez, Rosemary Medina, Angie Minutillo Rodriquez, Adarsh Passi, Gilda Raimondi, Maria Rodriguez, Rita Stephan. Theresa Tipone, and Mario Guerra. The Group B Claimants include Evelyn Abell, Donna Corizzi, Jennifer Diaz, Kim Torres. Sheila Vanderhoff, and Elizabeth Wade. The Group C Claimants include Phyllis De Lanzo (former Bidermann employee), George Allegrini, Dervin Benette, Marge Callery, Iride Campagna, Salvatore Fontana, Beverly Hurst, Freddy Sandavol, Everton Taylor, Denise Waga and George Wilson.

davits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.

*Nationwide Life Insurance Co. v. Bankers Leasing Association, Inc.,* 182 F.3d 157, 160 (2d Cir.1999) (quoting *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir. 1995)). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather it is to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In an attempt to defeat summary judgment, Claimants assert as issues of material fact that: (i) Bidermann repeatedly promised the Group A Claimants in writings, including the October 11th Memorandum, that employees who remained in Bidermann's employ until their stated termination dates would be paid a stay bonus, regardless of whether they were subsequently offered employment with Polo; (ii) Bidermann, as plan administrator, had breached its fiduciary duty by defrauding Claimants and materially misrepresenting to them the terms of the stay bonus program; (iii) Bidermann, in its October 11th Memorandum, offered to pay a stay bonus to the Group A Claimants, who, by remaining in their positions until their stated termination dates, accepted Bidermann's offer, creating an enforceable unilateral contract; (iv) Bidermann, by certain of its supervisory personnel, orally promised the Group B Claimants payment of a stay bonus if they did not seek other employment prior to their stated termination dates, creating an implied oral employment agreement; and (v) it was a matter of company policy to pay a stay bonus to the Group C Claimants. Before turning to the merits of Bidermann's summary judgment motion, however, I must first address the choice of law issues because of the number of contacts the parties have with the states of New York and New Jersey.

### I.

In determining the correct law to be applied, I could look to federal common law choice of law rules on the theory that bankruptcy jurisdiction, including jurisdiction to determine claims, is federal question jurisdiction. *See In re Best Products Co., Inc.,* 168 B.R. 35, 51 (Bankr.S.D.N.Y. 1994) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 795 (2d Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981)) (federal common law in specialized areas where jurisdiction is not based on diversity has been sanctioned by the Supreme Court since the *Erie* case was decided). "The federal common law ap-

proach, consonant with section 6(2) of the Restatement (Second) of Conflict of Laws, is to employ the law of the jurisdiction with the most significant relationship." *Id.* at 51. One other possibility is that I could look to the forum's, that is, New York's choice of law rules to determine the substantive law governing an objection to a claim under section 502 of the Bankruptcy Code. New York's choice of law rules require an application of the "center of gravity" theory. "According to this theory, the law of the state 'which has the most significant contacts with the matter in dispute' must be applied." *In re Chateaugay Corp.,* 170 B.R. 551, 555 (S.D.N.Y.1994) (quoting *Auten v. Auten,* 308 N.Y. 155, 160, 124 N.E.2d 99 (1954)). *See also In re Finley, Kumble, Wagner, Heine, Underberg,* 192 B.R. 342 (Bankr.S.D.N.Y.1994), *aff'd* 194 B.R. 728 (S.D.N.Y.1995). Under either the federal common law "substantial relationship" approach or New York's "center of gravity" test for choice-of-law questions, New Jersey law applies. All significant events relating to the alleged fraud and misrepresentation took place in New Jersey. In addition, all of the Claimants were employed by Bidermann in New Jersey.

The parties differ as to whether Bidermann in its October 11th Memorandum or in other writings promised to pay the Group A Claimants a stay bonus regardless of whether Polo subsequently offered them employment. Under both New York and New Jersey law, the court determines, as a question of law, whether a contract term is ambiguous. *The Guardian Life Ins. Co. v. Goduti–Moore,* 36 F.Supp.2d 657, 662 (D.N.J.1999); 22 N.Y.Jur.2d Contracts § 215 (1996). Under New Jersey law, "[a] contract is ambiguous if its terms 'are susceptible to at least two reasonable alternative interpretations.'" *Id.* (quoting *Kaufman v. Provident Life & Cas. Ins. Co.,* 828 F.Supp. 275, 282–83 (D.N.J.1992)); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1011 (3d Cir. 1980). "In determining whether an ambiguity exists, New Jersey law permits us to consider 'the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.'" *Id.* (quoting *American Cyanamid v. Fermenta Animal Health Co.,* 54 F.3d 177, 181 (3d Cir.1995)). "A contract term which is unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently." *Id.* (citation omitted). Under New York law, "[w]hether an agreement is ambiguous is a question of law for the courts. Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Kass v. Kass,* 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 696 N.E.2d 174 (1998) (citations omitted). Courts, in deciding whether an agreement is ambiguous,

should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought. (citation omitted). Where the document makes clear the parties' overall intention, courts examining isolated provisions 'should then choose that construction which will carry out the plain purpose and object of the [agreement].'

*Id.,* 91 N.Y.2d at 566–567 (quotation omitted). But "where the meaning of a contract provision is 'uncertain or ambiguous' and depends upon parol evidence admitted in aid of interpretation, the meaning of the doubtful provision should be left to the jury." *Goduti–Moore,* 36 F.Supp.2d at 662 (quotations omitted).

As to the issue of which state's law applies with respect to the Claimants' claims for an enhanced retirement benefit

and a stay bonus under the theories of fraud, misrepresentation or estoppel, Bidermann argues that New York law would apply because the pension plan was a company-wide policy available to all participants in the Debtors' pension plan and Bidermann's principal place of business was in New York. The Claimants, on the other hand, contend that New Jersey law would apply because they worked in New Jersey. With respect to the issues of fraud, material misrepresentation and estoppel, I need not determine which state's law applies because the elements of each cause of action must be proven by clear and convincing evidence under either New York or New Jersey law. *See Miller v. American Family Publishers,* 284 N.J.Super. 67, 663 A.2d 643, 656 (Ch.Div.1995); *Hennessey v. General Acc. Ins. Co. of America,* 257 A.D.2d 750, 683 N.Y.S.2d 342, 343 (1999); *Michaels v. Travelers Indem. Co.,* 257 A.D.2d 828, 683 N.Y.S.2d 640, 641–42 (1999); *In re Application of Mendez v. Reynolds,* 248 A.D.2d 62, 681 N.Y.S.2d 494, 497 (1998); *M.S. v. K.T. et al.,* 177 Misc.2d 772, 676 N.Y.S.2d 898, 900 (N.Y.Fam.Ct.1998); *Eileen T. Quigley, Inc. v. Miller Family Farms, Inc.,* 266 N.J.Super. 283, 629 A.2d 110, 117 (App. Div.1993); *Muller v. Hannon,* 223 A.D.2d 693, 637 N.Y.S.2d 433 (1996); *Fox v. Mercedes–Benz Credit Corp.,* 281 N.J.Super. 476, 658 A.2d 732 (App.Div.1995); *Gennari v. Weichert Co. Realtors,* 288 N.J.Super. 504, 672 A.2d 1190, 1208 (App.Div.1996), *aff'd as modified,* 148 N.J. 582, 691 A.2d 350 (1997). *See also Goduti–Moore,* 36 F.Supp.2d at 662 ("Under choice-of-law principles ... where the laws of the two jurisdictions would have produced the same result, there is a 'false conflict,' and a court should avoid the choice-of-law question").

With respect to Claimants' claims for payment of the stay bonus, the parties have agreed that under the theories described above, because all of the Claimants were employed in New Jersey, New Jersey law is the appropriate state law to be applied. We will now turn to each of the arguments raised by the parties.

## II.

■ The Group A Claimants maintain that according to writings received from Bidermann, and in particular, the October 11th Memorandum, they are entitled to payment of a stay bonus if they remain in Bidermann's employ until their respective stated termination dates regardless of whether they received employment offers from Polo. They argue that because the October 11th Memorandum ambiguously describes their entitlement to a stay bonus, I am required to look to parol evidence to explain the intent of the parties. Bidermann maintains that the October 11th Memorandum is unambiguous, and, therefore, summary judgment is warranted.

■ When the meaning of contract language is at issue, summary judgment should be granted only if the contract language is unambiguous and the moving party is entitled to judgment as a matter of law. *Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.,* 180 F.3d 518, 521 (3d Cir.1999); *see also Newport Assocs. Dev. Co. v. Travelers Indem. Co.,* 162 F.3d 789, 791 (3d Cir.1998). As discussed in point I, *supra,* language in a contract is ambiguous if it is susceptible to at least two reasonable interpretations when examined in the context of the entire integrated agreement. However, "parties to a contract, however, may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers v. Rochester Telephone Corp.,* 7 F.3d 1091, 1095 (2d Cir. 1993) (citations omitted).

With these principles in mind, I find that the October 11th Memorandum is indeed ambiguous. The October 11th Memorandum unequivocally provides that an employee would be eligible for a stay bonus if he or she is not offered a position with Polo following termination. However, because the October 11th Memorandum does

not clearly address whether an employee is eligible for a stay bonus if he or she is offered re-employment with Polo, I must " 'consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings.' " *Newport Assocs.*, 162 F.3d at 792 (quotation omitted). "If the nonmoving party presents a reasonable alternative reading of the contract, then a question of fact as to the meaning of the contract exists which can only be resolved at trial." *Id.*

Bidermann asserts that it never intended to pay a stay bonus to the Group A Claimants who received offers of re-employment from Polo and that the October 11th Memorandum clearly so states. *See* Kaufman Aff. at ¶ 20. However, in his deposition testimony, Mr. Kaufman stated that "[t]he Stay Bonus was designed to make the transition effort go smoothly by giving employees an incentive to stay through the transition, so it would run smoothly." Kaufman at p. 80. Mr. Kaufman's understanding of the purpose for implementing the stay bonus program was echoed by Richard Bangs, Executive Vice President of Woven Manufacturing of RLW, who testified that "[t]o my knowledge, the purpose of the stay bonus program was to keep people in place that Bidermann needed to fulfill their agreement with Ralph Lauren Polo, to service the business until December 15, 1995." Transcript of Deposition Testimony of Richard Bangs, at p. 54. The testimony of both Mr. Kaufman and Mr. Bangs regarding the circumstances under which a stay bonus would be paid is buttressed by Bidermann's representations in its Stay Bonus Motion—that it decided to implement a stay bonus program for 111 of its employees whose corporate positions at the Secaucus and New York locations have been or will be eliminated in recognition of the dedication and contribution of these employees over the years and as an incentive for the employees to remain within Bidermann's employ until their stated termination dates to allow the Debtors' re-

structuring efforts to run as smoothly as possible. (Stay Bonus Motion, ¶¶ 17 and 18). Bidermann also stated in the Stay Bonus Motion that the pre-condition to receipt of benefits under the stay bonus program was the employee's continued employment with the company up through his or her actual date of termination. (Stay Bonus Motion, ¶ 20). The 111 employees, many of whom are the Group A Claimants, appeared on a list attached to the Stay Bonus Motion. (Stay Bonus Motion, Exh. A). There is no mention in the Stay Bonus Motion, which was dated August 31, 1995, after the Debtors entered into an agreement with Polo for the purchase of RLW, that a stay bonus would not be paid to any of its corporate employees who were offered employment with Polo. Despite the Debtors' urging to the contrary, evidence adduced by the Stay Bonus Claimants sufficiently raised a material issue of fact regarding the Debtors' intent to pay a stay bonus to those corporate employees of Bidermann who received written offers of employment from Polo. Therefore, summary judgment is denied on the issue of whether the Debtors, in their October 11th Memorandum and other writings, had promised to pay the Group A Claimants a stay bonus regardless of whether they were offered re-employment with Polo. We will now turn to the Group A Claimants' alternative argument that the Debtors' written offer to pay a stay bonus and their acceptance by performance created an enforceable unilateral contract.

"[A]n offer contemplating a unilateral contract almost invariably involves an exchange of the offeror's promise for the offeree's act; that is, the offeror is the party who becomes bound as promisor when the contract is formed by acceptance." 1 Lord WILLISTON ON CONTRACTS § 4:5 (4th ed.1990). "A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.' " *Weic-*

*hert Co. Realtors v. Ryan*, 128 N.J. 427, 608 A.2d 280, 284 (1992) (quoting *West Caldwell v. Caldwell*, 26 N.J. 9, 138 A.2d 402, 410 (1958)). "An offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact." *Id.*, 608 A.2d at 284 (citing RESTATEMENT (SECOND) OF CONTRACTS § 19(1) (1981)). Because I have already found that there are triable issues of fact regarding Bidermann's intent to pay the Group A Claimants a stay bonus and the meaning of the October 11th Memorandum, it logically follows that the same triable issues exist under this theory. Accordingly, Bidermann's motion for summary judgment on the issue of whether there exists an enforceable unilateral employment contract is denied.

### III.

■ The Group B Claimants[4] argue that they are entitled to a stay bonus based upon oral promises made by Dorothy Baumel, Andrew Bolt, and Anne Krajewski[5] if they remained in Bidermann's employ until their termination dates. The Group B Claimants assert that the oral promises and their acceptance of them, evidenced by their giving up their opportunity to seek employment elsewhere and remaining in Bidermann's employ until their termination dates, constitute an oral

4. Group B Claimants Jennifer Diaz. Sheila Vanderhoff and Elizabeth Wade are former RLW employees, whereas Group B Claimants Donna Corizzi, Kim Torres and Evelyn Abell are former Bidermann employees.

5. Ms. Baumel, the former Vice President of Finance for RLW, accepted employment with Polo. In July 1995, Mr. Bolt was the Chief Financial Officer for RLW and Anne Krajewski was a Vice President of Bidermann.

6. To establish the existence of an oral implied employment contract, a plaintiff must show: "(1) that the oral employment policy contained 'an express or implied promise concerning the terms and conditions of employment'; (2) that the policy was 'a definitive, established, company-wide policy'; (3) that the oral statement of policy by a supervisor

implied employment contract[6]. Bidermann seeks summary judgment, denying that such promises were made or that with respect to the Group B Claimants' claims because it neither promised nor intended to pay a stay bonus to either the RLW or Bidermann employees offered positions with Polo. *See* Bangs Dep. Tr. at pp. 16, 20; Kaufman Aff. at ¶¶ 7-9; Transcript of Deposition Testimony of Dorothy Baumel at pp. 22-28, to be referred to as "Baumel at ____". In opposition, the Group B Claimants submitted certifications in which they maintain that they were orally advised by either Dorothy Baumel, Andrew Bolt or Anne Krajewski in mid-July 1995 that they would be eligible for a stay bonus if they remained in their positions through their respective termination dates. *See* Opposition of Stay Bonus Claimants, Exhibit J. Dorothy Baumel. Andrew Bolt and Anne Krajewski deny having made such promises. *See* Affidavits of Anne Krajewski, sworn to on May 28, 1998, to be referred to as "Krajewski Aff. at ____"; Andrew Bolt, sworn to on May 27, 1998 to be referred to as "Bolt Aff. at ____"; and Baumel at pp. 23-24. Ms. Baumel testified that, relying on the July 10th Memorandum, she informed employees that the company policy was that "if an offer of employment was received from Polo, ... the individuals would not be entitled to a stay bonus." Baumel at p. 25. Five of the

constituted an 'accurate representation of policy'; and (4) that the supervisor was 'authorized to make' the oral statements of policy."

*Ditzel v. University of Medicine and Dentistry of N.J.*, 962 F.Supp. 595, 607 (D.N.J.1997) (quoting *Gilbert v. Durand Glass Mfg. Co. Inc.*, 258 N.J.Super. 320, 609 A.2d 517, 522 (App. Div.1992)). *See also Fischer v. Allied Signal Corp.*, 974 F.Supp. 797, 808 (D.N.J.1997). "[I]f an expression of policy receives wide distribution within the company, then it could give rise to an implied contract if it contains an express or implied promise regarding the terms and conditions of employment." *Brennan v. Nat'l Telephone Directory Corp.*, 881 F.Supp. 986, 999 (E.D.Pa.1995) (citing *Witkowski v. Thomas J. Lipton. Inc.*, 643 A.2d 546, 550 (N.J.Sup.Ct.1994)).

Group B Claimants maintain that they did not receive written offers of employment from Polo until their termination dates and had remained in the Debtors' employ based upon the oral promises made to them in July.[7] *See* Certifications of Jennifer Diaz, Sheila Vanderhoff, Elizabeth Wade, Kim Torres and Evelyn Abell. Dorothy Baumel acknowledged that the stay bonus program was "inconsistently communicated" to those employees who did not receive offers of employment from Polo until a rather late date. Baumel at pp. 45–46.

It appears that Mr. Bolt, Ms. Krajewski and Ms. Baumel communicated the parameters of the stay bonus program to the Group B Claimants at informational meetings held in mid-July of 1995. The July meetings were held shortly after distribution of the July 10th and 17th Memoranda, and prior to Bidermann's execution of the agreement to sell RLW. Neither the July 10th nor July 17th Memoranda mentioned that an employee's non-receipt of an offer of employment from Polo was a condition precedent to receipt of a stay bonus. However, Mr. Bolt and Ms. Krajewski, in their affidavits, assert that they had not made the oral promises, as claimed by the Group B Claimants, and that "[i]t was the policy of Bidermann that only those employees who remained in Bidermann's employ and did not receive an offer of employment from Lauren Enterprises following the sale were entitled to a stay bonus or enhanced retirement benefits pursuant to Bidermann's Pension Plan." *See* Bolt Aff. at ¶ 3; Krajewski Aff. at ¶ 3. *See also* Baumel at pp. 24–25.

Summary judgment is inappropriate on the Group B Claimants' claim of an oral implied employment. There are questions of material fact whether such oral promises were made and whether the Group B Claimants received any writings from the Debtors regarding company policy which contradicted the oral representations of policy, which, according to the Group B Claimants, were made to them. Statements made by Richard Bangs, Andrew Bolt and other members of the Debtors' management regarding company policy could have the appearance of corporate legitimacy because the statements were not clarified and came from supervisors or other higher level employees. Thus, the Group B Claimants, unlike the Group C Claimants as discussed in Point IV, *infra*, may have reasonably relied on representations from supervisors or other higher level employees as accurate statements of corporate policy. The legitimacy of the representations and the reasonableness of the Group B Claimants' reliance are questions for the finder of fact that are not appropriate for summary judgment. The Group B Claimants contend that they accepted performance of the Debtors' oral promises by giving up their opportunity to seek other employment and remaining in their positions through their termination dates. Although the facts do not support an inference that the Group B Claimants, by remaining in their positions, gave up the opportunity to seek other employment,[8] it is undisputed that the Group B

---

7. Although Donna Corizzi, in her certification, does not state when she received her offer of employment from Polo, it appears from her certification that she may have received the offer after her termination date.

8. The only evidence submitted by the Group B Claimants, in support of their argument that by remaining in their positions they gave up the opportunity to look for other employment, is the deposition testimony of Jennifer Diaz, in which she stated that she did not look at employment advertisements and did not recall how much time she spent in connection with talking to employment agencies, combing through employment advertisements and interviewing. Transcript of Deposition Testimony of Jennifer Diaz at p. 46. Her deposition testimony is insufficient evidence that she had given up the opportunity to look for other employment. Rather, it appears that Ms. Diaz made little effort to seek new employment. She, and the other Group B Claimants, were never precluded from looking for other employment, especially since five of the Group B Claimants remained in Bidermann's employ without having received any offer of

Claimants performed their positions and remained in the Debtors' employ through their termination dates.

## IV.

■ The Group C Claimants, not having received the October 11th Memorandum or any written or oral offer of employment with Polo, claim that they are entitled to benefits as a matter of company policy. Excerpts from the deposition testimony of only four Group C Claimants—George Allegrini, Denise Waga, Freddy Sandoval and Phyllis DeLanzo—were submitted by the parties. George Allegrini testified that he "sort of believed that Polo employees would be entitled to a stay bonus," and had overheard discussion of the program among other employees in the warehouse, but that he never spoke to any supervisor or officer of Bidermann or any of its subsidiaries concerning the stay bonus. Transcript of Deposition Testimony of George Allegrini, at pp. at 16, 22. Denise Waga testified that she "was made aware of the stay bonus through other employees," but also did not speak to any officer of Bidermann or any of its subsidiaries or divisions concerning the stay bonus. Transcript of Deposition Testimony of Denise Waga, at p. 34. Freddy Sandoval testified that he heard about the stay bonus program by "word of mouth," but neither received anything in writing about the program or had any conversations with any officer or supervisor of Bidermann which led him to believe that he might be entitled to a stay bonus. Transcript of Deposition Testimony of Freddy Sandavol, at pp. 28–29. Phyllis De Lanzo testified that Ms. Baumel advised her that if she received an offer of employment from Polo, she would not be entitled to a stay bonus. Transcript of Deposition Testimony of Phyllis De Lanzo, at pp. 28–29, 93.

■ The Group C Claimants' vague and unsubstantiated statements are insuf-ficient to raise a material issue of fact regarding their entitlement to a stay bonus as a matter of company policy. The evidence submitted does not suggest that any promises or representations by an officer or supervisor of Bidermann were ever made to them. Rumors, alone, may not be properly considered to defeat a motion for summary judgment. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers*, 969 F.2d 1384, 1388 (2d Cir.1992) ("Only 'such facts as would be admissible in evidence' are properly consideration on a motion for summary judgment.") (quoting Fed. R.Civ.P. 56(e)). Nor may hearsay be used as competent evidence to defeat a motion for summary judgment. *See ABB Indus. Sys., Inc. v. Prime Technology, Inc.*, 120 F.3d 351, 357 (2d Cir.1997). *See also U.S. v. St. John's General Hospital*, 875 F.2d 1064, 1070 (3d Cir.1989); *Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1230 (3d Cir.1988). Testimony about rumors of offers of stay bonuses as evidence of the existence of a company policy is inadmissible hearsay and therefore, may not properly be considered on a motion for summary judgment. *See Fashion Boutique of Short Hills, Inc.*, 942 F.Supp. 209, 215 (S.D.N.Y. 1996); FED.R.EVID. 802. Moreover, the Group C Claimants' reliance upon an extrapolation of Ms. Baumel's testimony that she could not recollect if "anybody else at Bidermann ever communicate[d] the company policy that if an employee received an offer of employment from Polo they would not be entitled to a stay bonus,"[9] as evidence of Bidermann's company policy, even when viewed in a light most favorable to the Group C Claimants, is insufficient to create a genuine issue of material fact regarding the terms of Bidermann's company policy. Accordingly, summary judgment with respect to the Group C Claimants' claims is granted.

## V.

■ Claimants also maintain that Bidermann, as administrator of the compa-

employment with Polo until their termination dates.

9. Baumel at p. 26.

ny's retirement income plan and as a fiduciary, is liable under ERISA for money damages arising from breach of its fiduciary duty by materially misrepresenting the pre-conditions for receipt of a stay bonus and retirement benefits, and under the theories of fraud and equitable estoppel. Nonetheless, Claimants are not requesting a decision on the merits of these arguments, but are raising them to show that fact questions exist regarding the Debtors' alleged material misrepresentation of entitlement to a stay bonus by "failing to graphically advise the stay bonus claimants that if they continued to work for Bidermann and were re-hired by Polo that they would not be paid the retirement benefits," and by "attempting to trick the stay bonus claimants who received notices in writing to believing that they were being given a bona fide offer." *See* Brief of Stay Bonus Claimants In Opposition To Debtors' Motion For Summary Judgment, pp. 34–35. These arguments were raised in the context of the Claimants' other theories of recovery, which were addressed in points II and III, *supra.* In response, Bidermann argues that it is entitled to

summary judgment with respect to the Claimants' claim of entitlement to money damages under ERISA because they failed to meet their burden of proving fraud, breach of fiduciary duty or estoppel.

As previously discussed, Claimants are not entitled to an enhanced retirement benefit under the Third Amendment to Bidermann Retirement Income Plan. With respect to Claimants' argument that they are entitled to money damages under ERISA based on theories of breach of fiduciary duty, equitable estoppel and fraud theories, I question, as a threshold matter, whether the stay bonus program approved by this Court constitutes a plan under ERISA because it appears that Bidermann would only need to make a single arithmetical calculation to determine the amount of the stay bonus, which would be paid in one lump sum and which may or may not result in periodic demands upon Bidermann's assets requiring the need to create an administrative scheme to coordinate and control its finances.[10]

Nonetheless, assuming that the stay bonus program constitutes a plan which falls

---

**10.** The term "employee benefit plan" or "plan" means "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(2)(B)(3). Under the Debtors' stay bonus program, a qualified employee would receive a "stay-on bonus" in the form of a lump sum payment based upon a percentage of the employee's annual salary. *See* Stay Bonus Motion, ¶ 19.

The test to determine whether a plan is covered by ERISA is whether the benefits require an ongoing administrative scheme. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11–12, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (the Supreme Court, in holding that a state statute requiring employers to provide a one-time severance payment to workers in the event of a plant's closing or relocation did not constitute a benefit plan under ERISA, stated that "[t]he requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a

need for financial coordination and control."). Under the law of the Third Circuit, a plan for awarding severance benefits is an ERISA plan if it identifies a potential class of participants and requires an administrative scheme. *See Pane v. RCA Corp.*, 868 F.2d 631, 634 (3d Cir.1989). *See Angst v. Mack Trucks, Inc.*, 969 F.2d 1530 (3d Cir.1992) (buyout plan in which employees would be paid an initial lump-sum payment followed by one year of continued benefits did not constitute an ERISA plan because they did not involve the creation of a new administrative scheme. The disbursement of the lump-sum payment would not require an ongoing administrative scheme and the year of continued benefits would be administered pursuant to an already existing benefits plan.). *See also Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir.1997) (the court, analyzing a severance agreement signed by 25 employees that contained a provision requiring the employer to determine whether the employee was terminated for cause in calculating the size of the payment due, determined that "minimal quantum of discretion" to be exercised was insufficient to turn the severance agreement into an ERISA plan.).

90

within the ambit of ERISA, as the parties have, I find, after drawing all inferences and resolving all ambiguities in favor of the Group A and Group B Claimants[11], as I am required to do, that they have submitted proof sufficient to enable a reasonable trier of fact to conclude that they have demonstrated each essential element of a cause of action based upon the theories of breach of fiduciary duty, equitable estoppel and fraud.

■ Section 404(a) of ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries...." 29 U.S.C. § 1104(a)(1). Failure to carry out the duties imposed by Section 404(a) may subject a fiduciary to direct liability under Section 502(a) of ERISA. "Based upon the obligations imposed by Section 404(a)(1), a fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed." *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir.1999) (citations omitted). A misrepresentation is material " 'if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision.' " *Id.* (quoting *Unisys Corp. Retiree Med. Benefit "ERISA" Lit.*, 57 F.3d 1255, 1264 (3d Cir.1995)). To make out a claim for breach of fiduciary duty under ERISA, the Group A and Group B Claimants must show that Bidermann while acting in a fiduciary capacity, made affirmative misrepresentations or failed to adequately inform the plan participants and beneficiaries, knew of the confusion generated by its misrepresentations or its silence, and that there was resulting harm to employees. *Id.* Drawing all inferences and resolving all ambiguities in their favor, I find that the Group A and Group B Claimants submitted proof sufficient to en-

able a reasonable trier of fact to conclude that they have demonstrated each essential element of this cause of action. Moreover, as I determined in points II and III, *supra*, genuine issues of fact exist regarding whether Bidermann had materially misrepresented to the Group A and Group B Claimants the conditions upon which they would receive a stay bonus, whether Bidermann had intended to pay them a stay bonus and whether the Group A and Group B Claimants relied upon those alleged misrepresentations to their detriment, warranting denial of Bidermann's motion for summary judgment with respect to this cause of action.

■ To establish a claim for equitable estoppel under ERISA, a plaintiff must establish "(1) a material misrepresentation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Curcio v. John Hancock Mutual Life Insurance Co.*, 33 F.3d 226, 235 (3d Cir.1994); *Unisys Corp. Retiree Medical Benefit "ERISA" Lit.*, 58 F.3d 896, 907 (3d Cir.1995). To show extraordinary circumstances, "a claimant must produce evidence of affirmative acts of fraud or similarly inequitable conduct by an employer, ... misrepresentations that arise[ ] over an extended course of dealings between parties, ... [or] the vulnerability of particular plaintiffs." *Int'l Union*, 188 F.3d at 152 (quoting *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir.1996)). Here, drawing all inferences and resolving all ambiguities in favor of the Group A and Group B Claimants, as I must, I find that the Group A and Group B Claimants have presented evidence which supports an inference that Bidermann, at the time it sought approval of the stay bonus program until termination of the claimants' employment with Bidermann, did not disclose to the Group A and Group B Claimants that they would not receive a stay bonus if they were offered re-employ-

11. Having found that the Group C Claimants are not entitled to payment of a stay bonus, Bidermann, as the plan's alleged fiduciary, would not owe the Group C Claimants any duty, the breach of which could result in liability under ERISA for money damages.

ment with Polo, despite informational meetings and inquiries. Although Bidermann argues that the Group A and Group B Claimants were not ultimately harmed because they were re-employed at Polo at the same salary levels and with comparable positions and benefits, there is ample evidence in the record that many of the Group A and Group B Claimants did not receive an offer of re-employment with Polo until the eve of termination of their employment with Bidermann. Thus, an inference may be drawn that these claimants, in making their decision not to seek other employment, relied upon the written and oral information provided to them by corporate supervisory personnel that they would receive a stay bonus if they remained in Bidermann's employ until their termination dates. Such questions of fact regarding whether Bidermann made such misrepresentations or other inequitable conduct and whether the Group A and Group B Claimants detrimentally relied upon them warrant denial of Bidermann's motion for summary judgment with respect to this cause of action. We will now turn to the issue of whether Bidermann is entitled to summary judgment with respect to the Group A and Group B Claimants' claim for fraud.

To establish a *prima facie* case for fraud under New Jersey law, a plaintiff must prove: "that [the defendant] made a material misrepresentation of a presently existing or past fact, (2) which he knew or believed to be false, (3) upon which he intended [the plaintiff] to rely, (4) and upon which [the plaintiff] reasonably did rely, (5) with resulting damages." *In re Resorts International, Inc.,* 181 F.3d 505, 509 (3d Cir.1999). Each element must be proven by clear and convincing evidence. *Id.* Again, drawing all inferences and resolving all ambiguities in favor of the non-moving parties, I find that granting summary judgment, as Bidermann urges, would be inappropriate in this case. "Findings as to fraudulent intent are peculiarly fact-intensive and as an affirmative

finding can rarely be made as a matter of law." *In re Barral,* 153 B.R. 15, 17 (S.D.N.Y.1993), *aff'd,* 17 F.3d 1426 (2d Cir. 1994). As previously discussed, the Group A and Group B Claimants have come forth with ample evidence upon which a reasonable trier of fact could find that Bidermann engaged in fraud with respect to the stay bonus program. Evidence has been presented that Bidermann had, either affirmatively or through silence, not disclosed to the Group A and Group B Claimants that receipt of an employment offer from Polo would result in the claimants not receiving a stay bonus, that Bidermann knew that the claimants would rely upon written and oral statements which the corporate supervisory personnel had made to them regarding the conditions for receipt of a stay bonus, that Bidermann intended that the claimants rely upon its representations to ensure a smooth transition and sale, that the claimants had reasonably relied upon such written and oral statements by remaining in Bidermann's employ until their termination dates, and they were damaged thereby by not receiving the stay bonuses. Because the Group A and Group B Claimants' claims for material misrepresentation, equitable estoppel, and fraud are conceptually related, the disposition of these common factual issues will necessarily affect each of these claims. Therefore, summary judgment is denied.

## VI.

### Conclusion

In summary, Bidermann's motion for summary judgment is GRANTED with respect to the Claimants' claims for enhanced retirement benefits under the Third Amendment to the Bidermann Retirement Income Plan and to the Group C Claimants' claim for a stay bonus. Bidermann's motion for summary judgment is DENIED with respect to the Group A and Group B Claimants' claims for entitlement to a stay bonus and to the Group A and Group B Claimants' claim for money damages under ERISA arising from Bider-

mann's alleged breach of its fiduciary duty and under the theories of fraud and equitable estoppel.